# UNITED STATES AIR FORCE
# COURT OF CRIMINAL APPEALS

————————————

**No. ACM 40371**

————————————

**UNITED STATES**
*Appellee*

**v.**

**James L. TAYLOR, Jr.**
Staff Sergeant (E-5), U.S. Air Force, *Appellant*

————————————

Appeal from the United States Air Force Trial Judiciary

Decided 31 July 2024[1]

————————————

*Military Judges*: Colin P. Eichenberger (arraignment and motions); Elijah F. Brown.

*Sentence*: Sentence adjudged 29 June 2022 by GCM convened at Davis-Monthan Air Force Base, Arizona. Sentence entered by military judge on 28 July 2022: Dishonorable discharge, confinement for 19 months, and reduction to E-1.

*For Appellant*: Major Frederick J. Johnson, USAF (argued); Major Jenna M. Arroyo, USAF; Megan P. Marinos, Esquire.

*For Appellee*: Colonel Steven R. Kaufman, USAF (argued); Colonel Matthew D. Talcott, USAF; Lieutenant Colonel Thomas J. Alford, USAF; Lieutenant Colonel J. Peter Ferrell, USAF; Major Olivia B. Hoff, USAF; Captain Tyler L. Washburn, USAF; Mary Ellen Payne, Esquire.

Before RICHARDSON, MERRIAM, and DOUGLAS, *Appellate Military Judges*.

Judge MERRIAM delivered the opinion of the court, in which Senior Judge RICHARDSON and Judge DOUGLAS joined.

————————————

[1] The court heard oral argument in this case on 21 March 2024.

**This is an unpublished opinion and, as such, does not serve as precedent under AFCCA Rule of Practice and Procedure 30.4.**

———————————————

MERRIAM, Judge:

A general court-martial composed of a military judge sitting alone convicted Appellant, contrary to his pleas, of one specification of sexual assault and one specification of abusive sexual contact, in violation of Article 120, Uniform Code of Military Justice (UCMJ), 10 U.S.C. § 920.[2] The adjudged sentence was a dishonorable discharge, confinement for 19 months,[3] reduction to the grade of E-1, and a reprimand. The convening authority took no action on the findings, and disapproved the reprimand.

Appellant asserts five issues on appeal, summarized here: (1) whether the general court-martial had jurisdiction over Appellant at the time of the offenses, at the preliminary hearing, at arraignment, and at trial; (2) whether the specifications were defective because they failed to allege Appellant's military status that was the basis for jurisdiction; (3) whether the findings of guilty are legally insufficient because no evidence was admitted at trial to establish the status that subjected Appellant to UCMJ jurisdiction; (4) whether the Government violated Appellant's right to speedy trial under Rule for Courts-Martial (R.C.M.) 707 and the Sixth Amendment to the United States Constitution[4] when the charge and specifications were dismissed and later re-preferred; and (5) whether the findings of guilty are factually sufficient. We address each issue in turn, combining our discussion of issues (2) and (3). Finding no error materially prejudicial to Appellant's substantial rights, we affirm the findings and sentence.

———————————————

[2] All references in this opinion to the UCMJ, the Military Rules of Evidence, and the Rules for Courts-Martial (R.C.M.) are to the *Manual for Courts-Martial, United States* (2019 ed.).

[3] Appellant was sentenced to 19 months for the sexual assault and 6 months for the abusive sexual contact, to run concurrently.

[4] U.S. CONST. amend. VI.

**I. BACKGROUND**

Appellant was a staff sergeant in the United States Air Force Reserve,[5] assigned to an aircraft maintenance squadron that was part of an Air Force reserve fighter group located at Davis-Monthan Air Force Base, Arizona.

On 7 and 8 December 2019, members of the fighter group were scheduled to perform periods of inactive duty training (IDT) that Saturday and Sunday, commonly referred to as a "drill weekend." On 7 December 2019, Appellant performed a full day (two four-hour periods) of IDT with the fighter group. That evening, Appellant attended a birthday party at the home of Technical Sergeant (TSgt) VA, a friend and fellow member of his reserve unit. Approximately a dozen people attended TSgt VA's party, most of whom were fellow enlisted members of Appellant's reserve unit, and many of whom had previously that evening attended a unit holiday function that Appellant did not attend. TSgt VA's party began sometime around 2200 hours. At the party, all partygoers were drinking alcohol, and some partygoers played drinking games, card games, or video games. According to witnesses, all the attendees became intoxicated (to varying degrees) at some point during the party. At one point, TSgt VA saw Appellant make AG a mixed drink.[6] When Appellant made TSgt VA a mixed drink that was "too strong," TSgt VA told Appellant she would make her own drinks and AG's drinks. At another point in the evening, AG briefly sat on Appellant's lap while he was seated at the kitchen table where a drinking game was being played. Appellant got her off his lap, telling her, "You're too drunk for that." Later, while AG, Appellant, and Staff Sergeant (SSgt) DW were sitting on the couch in the living room, AG was sufficiently intoxicated that she was apparently unaware her "skirt was riding up" and SSgt DW and Appellant attempted to get her to put some shorts on.

As the party wound down during the early morning hours of 8 December 2019, most attendees left, except TSgt VA and Ms. GF, who both lived in the home, SSgt DW, AG, and Appellant. Observing that AG, who at this point had been drinking since dinnertime at the holiday function, was drunk, getting sleepy, and had just lied down on the couch in the living room as though she was about to sleep, TSgt VA and Ms. GF put AG to bed in Ms. GF's bedroom.

---

[5] Appellant was also an Air Reserve Technician, a unique position with two components: Appellant was employed as a government civilian employee in the same Air Force reserve unit in which he was a reserve member, and essentially performed the same duty as a civilian "during the week" that he would when serving in uniform in a reserve status.

[6] At the time of the offenses in this case, AG was an enlisted Airman in the United States Air Force Reserve, assigned to the same unit as Appellant, and junior to Appellant in rank.

TSgt VA was concerned enough about AG's state of intoxication that when she took AG to bed, she brought her "a trash can, just in case." Appellant witnessed TSgt VA take AG to the bedroom and, while TSgt VA and Ms. GF were still in the bedroom with AG, Appellant knocked on the door requesting to come in and say goodnight to AG. When he entered the room, AG was lying on the bed. Appellant said goodnight to AG and kissed her on the cheek in front of TSgt VA and Ms. GF.

At around 0400 hours, Appellant, who testified he was aware AG was "very intoxicated" and had previously gone to sleep, went into the bedroom where she was sleeping. He lay down on the bed next to AG and, as she slept, digitally penetrated AG's vulva and kissed her buttocks. As AG testified at trial, the "force [of Appellant's fingers] in [her], in [her] vagina," caused her to wake up. Though at first she was stunned and confused about what was happening, she got up from the bed and went to the bathroom. Shortly thereafter, AG left TSgt VA's home. While driving home, AG attempted to call TSgt VA's cell phone. Appellant, who had by this point left the bedroom and was in the kitchen, noticed AG's call coming into TSgt VA's cell phone, which TSgt VA had inadvertently left in the kitchen. When he looked at TSgt VA's phone, Appellant grunted, then silenced the phone. Moments later, Appellant knocked on TSgt VA's door. By this time, AG had successfully reached TSgt VA by calling Ms. GF's phone and, while crying and sounding "very scared," AG had told TSgt VA that she had woken up to Appellant "on her and touching her." When TSgt VA answered her door to find Appellant standing there, she confronted Appellant about the incident that had happened moments before, asking Appellant, "What the f[**]k happened, she's calling me, she's f[**]king crying. She f[**]king woke up and you were f[**]king touching her." Appellant responded "Yes." Appellant repeatedly pleaded that he had "f[**]ked up" and was sorry. At one point he told TSgt VA, "I honestly did not mean to do that, like f[**]king drinking, bad things when I'm drinking. Like I'm beyond sorry, I am absolutely sorry I did that to your friend."

When TSgt VA furiously told Appellant to leave her home, he complied. Over the next several hours, Appellant repeatedly told multiple individuals, including multiple friends who testified at trial, that he had "messed up." Appellant specifically told his "good friend" Master Sergeant (MSgt) BS that he "sexually assaulted [AG] with his hands" and that he "put his fingers in her vagina when she was sleeping." In addition to talking to multiple friends from the unit, Appellant's first sergeant, Chief Master Sergeant (CMSgt) SG, arrived at Appellant's home and Appellant similarly told him he had "messed up." While Appellant repeatedly acknowledged to multiple people during the morning hours of 8 December 2019 that he had "messed up," during these conversations he told no one, including his friends, that he thought AG had been awake or that she invited his presence in her room or his sexual advances.

During the morning hours of 8 December 2019, as Appellant was repeatedly acknowledging to multiple individuals he had "messed up," AG was also telling multiple individuals Appellant had digitally penetrated her while she was sleeping. AG and Appellant were "work acquaintances," but had no prior relationship with each other. No evidence was introduced at trial to suggest AG had any motive to fabricate her version of events.

## II. DISCUSSION

### A. Jurisdiction

Appellant makes three arguments related to jurisdiction: (1) Appellant was not subject to UCMJ jurisdiction at the time he committed the offenses because he did not perform IDT the day following the offenses; (2) Appellant was not on active duty for the preliminary hearing under Article 32, UCMJ, 10 U.S.C. § 832 (hereinafter Article 32), so the charges were thereafter improperly referred, and the court-martial did not have jurisdiction over him; and (3) Appellant was not properly recalled to active duty for arraignment and trial, so the court-martial did not have jurisdiction over him.

#### 1. Additional Background

##### *a. Appellant's Status at Time of Offenses*

Appellant's unit commander testified about Unit Training Assemblies (UTAs) and reserve participation. To meet the minimum standard for satisfactory participation, and thus earn a "good year" toward retirement, reserve members like Appellant assigned to his reserve maintenance squadron are expected annually to participate in a UTA one weekend each month, plus a two-week annual tour (AT) of active duty.[7] Like other traditional reserve units, UTAs, often referred to by reserve members as "drill weekend," are typically scheduled by the maintenance squadron 6 to 12 months in advance so Airmen have predictability regarding when they will be expected to attend and can coordinate with their civilian employers in advance. Orders are not generated for a UTA. When performing a UTA, a reserve member is in a unique military status referred to as inactive duty training (IDT). IDT is performed and recorded in "periods," which are typically four hours in length. A typical UTA weekend involves four IDTs—two each day. Reserve members are only in "IDT

---

[7] *See* Department of the Air Force Manual (DAFMAN) 36-2136, *Reserve Personnel Participation,* Table 1.1, n.3 (15 Dec. 2023) (guidance on UTAs); Department of Defense Instruction 1215.06, *Uniform Reserve, Training, and Retirement Categories for the Reserve Components*, Enclosure 7, ¶ 3.a (11 Mar. 2014, incorporating Change 2, 12 Jul. 2022) (explaining ATs).

status" during the four-hour IDT period and not "on IDT" during breaks between the periods, such as a lunch break or overnight.

Reserve members' performance of IDTs during UTAs is documented by the Appellant's maintenance squadron primarily through the Air Force's Unit Training Assembly Participation System (UTAPS). UTAPS may be updated to indicate performance of duty either when Airmen "swipe in" with their identification card upon arrival for their IDT or by manual entry in the UTAPS system. UTAPS data is then exported to another system that generates a "Listing of Export Form 40" (hereinafter Form 40), which is a roster of all members assigned to the unit, indicating their status during the UTA. For instance, if one or more of a member's IDT periods during the UTA was rescheduled, excused, or unexcused, it is noted on the Form 40. Additionally, an Air Force Form 40A, *Record of Individual Inactive Duty Training* (Apr. 2012) (AF Form 40A), may also be generated to indicate performance, rescheduling, or excusal from IDT, though Appellant's unit typically only issued them when rescheduling or indicating performance of the IDT would be at a different duty station.

Appellant's squadron scheduled a UTA the weekend of 7 and 8 December 2019. On Saturday, 7 December 2019, Appellant performed both periods of scheduled IDT. Then in the early morning hours of 8 December 2019, before performing the next two IDTs as part of his second day of the drill weekend to commence at 0630, Appellant committed the offenses of which he stands convicted.

Appellant did not physically report to his usual duty location on 8 December 2019. Instead, after learning about the offenses and being informed of Appellant's emotional state, Appellant's command instructed him to remain at home under the observation of other unit members due to concerns for his safety.[8] First to Appellant's home was MSgt BS, a member of Appellant's squadron who was also Appellant's friend. Eventually, MSgt BS called his unit first sergeant, CMSgt SG, who came to Appellant's apartment. CMSgt SG stayed with Appellant for several hours, even helping Appellant clean up his home because, in CMSgt SG's words, "[Y]ou're going to have a lot of people coming through and want to talk to you." Additional senior enlisted members were at Appellant's home during the day on 8 December 2019, including Appellant's supervisor, MSgt DB. Late in the morning on 8 December 2019, Appellant's unit sent a peer and friend, SSgt CG, to stay with Appellant at his home for a few hours.

---

[8] During the pretrial motion hearing, trial counsel and trial defense counsel specifically agreed that "the reason [Appellant] did not actually go in and perform duty on [December] 8th is because the unit kept him home after the allegation came out, and kept somebody there with him to keep an eye on him because of concerns about his safety."

Appellant's performance of duty on 7 and 8 December 2019 was recorded and demonstrated by the Government at trial in several ways. First, Appellant was recorded as participating in both days of the drill weekend in UTAPS, which at the time of trial indicated not only that Appellant was in status on both days but that he was paid for two IDT periods each day, for a total of four IDT periods that weekend. Accordingly, the Form 40 generated by the unit on 9 December 2019 also shows that Appellant performed all four IDTs that weekend.[9] Additionally, though it does not usually do so when members perform as scheduled, the unit generated an AF Form 40A that showed Appellant performed two IDT periods on 7 December 2019 and two more on 8 December 2019. Moreover, Appellant's Leave and Earnings Statement for December 2019 explicitly stated he was paid for two IDT periods on 7 December 2019 and two IDT periods on 8 December 2019. Nothing in the record indicates Appellant ever attempted to correct or return the pay or points, further explained *infra*, he received for 8 December 2019. Finally, during a pretrial motion hearing regarding jurisdiction, Lieutenant Colonel WL, Appellant's squadron commander at the time of trial but not on 7 and 8 December 2019, testified that she was told by CMSgt JC, the unit's senior enlisted leader at the time of the offenses, that Appellant was "in status" on both "the 7th and 8th of December 2019."

### b. Appellant's Status at Preliminary Hearing

Appellant was initially ordered to active duty by the general court-martial convening authority (GCMCA) for purposes of the preliminary hearing pursuant to Article 32, UCMJ. However, Appellant was in IDT status during the preliminary hearing, for which he was paid and received points. The date of the hearing, 25 September 2020, was arranged as a rescheduling of Appellant's ordinary drill weekend to accommodate a weekday for his civilian defense counsel's convenience.

### c. Appellant's Status at Arraignment and Trial

After the Article 32 proceeding, one specification of sexual assault and two specifications of abusive sexual contact, in violation of Article 120, UCMJ, were referred on 19 November 2021 to general court-martial against Appellant for the incident occurring on 8 December 2019. Pursuant to Article 2(d)(5), UCMJ, 10 U.S.C. § 802(d)(5) (hereinafter Article 2), a regular component GCMCA requested approval from the Secretary of the Air Force (SECAF) to recall Appellant to active duty in order to proceed with a general court-martial and

---

[9] Most members of Appellant's squadron were recorded as participating in all four IDTs that drill weekend, though some unit members' status was recorded on this list as "rescheduled," "excused," or "unexcused;" Appellant's status was recorded as worked for all four IDT periods.

preserve the possibility of confinement or restriction on liberty as a punishment option if Appellant was convicted of any of the referred offenses. On 3 June 2021, the Acting SECAF issued a memorandum to the GCMCA granting that request, approving "any recall to active duty of [Appellant] that you may hereafter order."

Later, the GCMCA issued an undated memorandum stating in relevant part Appellant "is involuntarily recalled to Active Duty for two days on 21 March 2022 to 22 March 2022 pursuant to [10 U.S.C. § 802(d)] . . . for the purpose of arraignment and motions for an alleged UCMJ violation." The memorandum included a fund cite for purposes of directing which account would pay for Appellant's active duty and other financial details. No further paperwork was generated ordering Appellant to active duty for arraignment, including Air Force Form 938, *Request and Authorization for Active Duty Training/Active Tour* (Jul. 2018) (AF Form 938), which Appellant now argues is evidence he was not properly recalled to active duty. Appellant was present at the motions hearing and subsequent arraignment.

On 16 June 2022, the GCMCA issued another memorandum stating in relevant part Appellant "is involuntarily recalled to Active Duty for seven days, from 26 June 2022 through 2 July 2022, pursuant to [10 U.S.C. § 802(d)] . . . for the purpose of trial by court-martial for an alleged UCMJ violation." Like the previous memorandum recalling Appellant for arraignment, this memorandum included a fund cite for purposes of directing which account would pay for Appellant's active duty and other financial details. Appellant was present for the entire court-martial.

During motions on the issue of jurisdiction at arraignment and trial, trial counsel submitted an affidavit from MSgt DW, the unit chief responsible for personnel administrative matters at Davis-Monthan Air Force Base. MSgt DW stated it was "not the practice of [Appellant's servicing administrative support unit] to generate AF Form 938."

The military judge denied Appellant's motion to dismiss, rejecting all three theories of lack of jurisdiction that Appellant again asserts now on appeal.

**2. Law**

### *a. Standard of Review*

We review questions of jurisdiction de novo. *United States v. Hale*, 78 M.J. 268, 270 (C.A.A.F. 2019) (citation omitted). When conducting our de novo review, we accept the military judge's findings of fact unless clearly erroneous or unsupported in the record. *United States v. Christensen*, 78 M.J. 1, 4 (C.A.A.F. 2018) (citation omitted).

### b. Court-martial Jurisdiction

"When challenged, the [G]overnment must prove jurisdiction by a preponderance of evidence." *Hale*, 78 M.J. at 270 (citing *United States v. Morita*, 74 M.J. 116, 121 (C.A.A.F. 2015)). "An inquiry into court-martial jurisdiction focuses on . . . whether the person is subject to the UCMJ at the time of the offense." *Id.* at 271 (omission in original) (quoting *United States v. Ali*, 71 M.J. 256, 261 (C.A.A.F. 2012)). After *Solorio v. United States*, 483 U.S. 435 (1987), the military status of the accused is the focus for determining both jurisdiction over the offense and jurisdiction over the person.[10] *Ali*, 71 M.J. at 264 (citation omitted). Court-martial jurisdiction requires the accused to be subject to the UCMJ at the time of the alleged offenses. *Id.* at 261–62 (citing *Solorio*, 483 U.S. 435).

Court-martial jurisdiction is determined by Article 2 and detailed in R.C.M. 201. R.C.M. 201(b) specifies five requisites for court-martial jurisdiction, including the following three criteria: (1) "[e]ach charge before the court-martial must be referred to it by competent authority;" (2) "[t]he accused must be a person subject to court-martial jurisdiction; and" (3) "[t]he offense must be subject to court-martial jurisdiction."

"[A]n administrative or clerical error committed by the Air Force in properly exercising its statutory jurisdiction over a member does not divest the court-martial of its otherwise lawful jurisdiction . . . ." *United States v. Ferrando*, 77 M.J. 506, 512 (A.F. Ct. Crim. App. 2017).

### c. Jurisdiction over Reserve Personnel

Prior to 1 January 2019, Article 2(a)(3) extended jurisdiction to "[m]embers of a reserve component while on inactive-duty training." 10 U.S.C. § 802(a)(3) (2016). Accordingly, we previously held, and our superior court affirmed, that jurisdiction did not exist over a reserve member outside the four-hour blocks of IDT, even if committed on the same day the accused performed IDT. *United States v. Hale*, 77 M.J. 598, 604 (A.F. Ct. Crim. App. 2018), *aff'd*, 78 M.J. 268 (C.A.A.F. 2019); *see also United States v. Wolpert*, 75 M.J. 777, 778 (A. Ct. Crim. App. 2016) (concluding jurisdiction does not exist over a reserve member who committed criminal acts between periods of IDT).

Congress amended Article 2 after the cases noted above and at the recommendation of the Military Justice Review Group (MJRG). *See* Office of the General Counsel, Dep't of Defense, *Report of the Military Justice Review Group*

---

[10] We note that the traditional phrases "subject matter jurisdiction" and "in personam jurisdiction" have been applied inconsistently by military courts. For clarity, we refer simply to "jurisdiction" or "jurisdiction over the offense" and "jurisdiction over the person," vice the traditional phrases.

*Part I: UCMJ Recommendations*, at 154–55 (22 Dec. 2015), https://jsc.defense.gov/Portals/99/MJRG%20Part%201.pdf (last visited 14 May 2024) (hereinafter *Report of the Military Justice Review Group*). Specifically, the MJRG urged that a "clarification in the law is needed to ensure that UCMJ jurisdiction applies to misconduct committed by an individual ordered to [IDT] throughout the drill period, including after working hours." *Id.* at 155.[11]

Enacting changes to Article 2(a)(3) verbatim as recommended by the MJRG, Congress added three new periods of UCMJ jurisdiction related to reserve members performing IDT: "(i) members traveling to and from the [IDT] training site; (ii) intervals between consecutive periods of [IDT] on the same day, pursuant to orders or regulations; and (iii) intervals between [IDT]s on consecutive days, pursuant to orders or regulations." 10 U.S.C. § 802(a)(3)(B).[12]

### d. *Reserve Personnel Ordered to Active Duty for Court-martial Proceedings*

"A member of a reserve component . . . may be involuntarily ordered to active duty" for a preliminary hearing under Article 32, trial by court-martial, or nonjudicial punishment under Article 15, UCMJ. 10 U.S.C. § 802(d)(1); *see also* Air Force Instruction (AFI) 51-201, *Administration of Military Justice*, ¶ 4.14.2.1 (18 Jan. 2019).

When amending Article 2(a)(3) to include jurisdiction over additional periods incident to IDT, Congress did not correspondingly amend Article 2(d). Article 2(d)(1) authorizes involuntary recall to active duty of reserve members for trial by court-martial. But Article 2(d)(2) states, "A member of a reserve component . . . may not be ordered to active duty under [Article 2(d)(1)] except with

---

[11] The MJRG observed that under the then-existing version of Article 2(a)(3), which provided jurisdiction over reserve members performing IDT, multiple jurisdictional gaps remained, including "misconduct by a reserve component member carried out while en route from their home to their IDT drill site, or while berthed in military housing . . . or during periods in between successive IDTs (i.e. meal breaks and Saturday evenings), or while en route from the IDT site to their home . . . ." *Report of the Military Justice Review Group*, at 154. The MJRG further noted that misconduct occurring during such periods, "which, for example, could include driving under the influence, damage to government quarters, or a crime of violence, has the potential to negatively affect good order and discipline in the armed forces." *Id.*; *see also Hale*, 78 M.J. at 275 (Ohlson, J., concurring in part and dissenting in part) (Congress amended Article 2 "to eliminate jurisdictional gaps that previously arose within the interstices of blocks of time dedicated to [IDT]" (citation omitted)).

[12] National Defense Authorization Act for Fiscal Year 2017, Pub. L. No. 114-328, § 5102, 130 Stat. 2000, 2921 (2016). The amendments to Article 2 became effective 1 January 2019.

respect to an offense committed while the member was—(A) on active duty; or (B) on inactive-duty training . . . ." 10 U.S.C. § 802(d)(2).

"A member of a reserve component must be on active duty prior to arraignment at a general or special court-martial." R.C.M. 204(b)(1). "The Secretary concerned shall prescribe regulations setting forth rules and procedures for the exercise of court-martial jurisdiction and nonjudicial punishment authority over reserve component personnel under Article[s] 2(a)(3) and 2(d) . . . ." R.C.M. 204(a). The Discussion accompanying R.C.M. 204(a) states that service regulations "should describe procedures for ordering a reservist to active duty for disciplinary action, preferral of charges, preliminary hearings, forwarding of charges, referral of charges, designation of convening authorities and commanders authorized to conduct nonjudicial punishment proceedings, and for other appropriate purposes."

> If the member is no longer in Federal status, on active duty, or in [IDT] status when the offense is discovered, the member may be involuntarily ordered to active duty for preferral and referral of charges, preliminary hearing, trial by general or special court-martial, and adjudged confinement or other restriction on liberty.

AFI 51-201, ¶ 4.14.2.1.

"A member may be ordered to active duty under [Article 2(d)(1)] only by a person empowered to convene general courts-martial in a regular component of the armed forces." 10 U.S.C. § 802(d)(4). "[U]nless the order to active duty under [Article 2(d)(1)] was approved by the Secretary concerned, [a member] may not—(A) be sentenced to confinement; or (B) be required to serve a punishment consisting of any restriction on liberty during a period other than a period of [IDT] or active duty . . . ." 10 U.S.C. § 802(d)(5).

### e. Statutory Construction

We review interpretation of a statute de novo. *United States v. Kohlbek*, 78 M.J. 326, 330–31 (C.A.A.F. 2019) (citation omitted). "In conducting this de novo review, [we] employ[ ] principles of statutory construction." *United States v. Beauge*, 82 M.J. 157, 162 (C.A.A.F. 2022) (citing *Kohlbek*, 78 M.J. at 330). "As in all statutory construction cases, we begin with the language of the statute." *United States v. McDonald*, 78 M.J. 376, 379 (C.A.A.F. 2019) (quoting *Barnhart v. Sigmon Coal Co.*, 534 U.S. 438, 450 (2002)). Such "inquiry must cease if the statutory language is unambiguous and 'the statutory scheme is coherent and consistent.'" *Robinson v. Shell Oil Co.*, 519 U.S. 337, 340 (1997) (quoting *United States v. Ron Pair Enterprises, Inc.*, 489 U.S. 235, 240 (1989)) (additional citation omitted). "The plainness or ambiguity of statutory language is determined by reference to the language itself, the specific context in which that language

is used, and the broader context of the statute as a whole." *Id.* at 341 (citations omitted). When we see a "facial ambiguity . . . we must interpret it in light of the broader context of the rule." *Beauge*, 82 M.J. at 162 (citation omitted).

The plain language will control unless its application would lead to an absurd result. *Lamie v. United States Trustee*, 540 U.S. 526, 534 (2004) (citations omitted); *Beauge*, 82 M.J. 157 (citation omitted); *United States v. Cabuhat*, 83 M.J. 755, 765 (A.F. Ct. Crim. App. 2023) (en banc) (citation omitted), *rev. denied*, __ M.J. __, No. 24-0018, 2024 CAAF LEXIS 62 (C.A.A.F. 30 Jan. 2024). "'[A] departure from the letter of the law' may be justified to avoid an absurd result if 'the absurdity . . . is so gross as to shock the general moral or common sense.'" *United States v. McPherson*, 81 M.J. 372, 380 (C.A.A.F. 2021) (quoting *Crooks v. Harrelson*, 282 U.S. 55, 60 (1930)). In *Beauge*, the Court of Appeals for the Armed Forces (CAAF) further explained: "Where 'only one of the permissible meanings produces a substantive effect that is compatible with the rest of the law,' that meaning will prevail." 82 M.J. at 162 (quoting *United Sav. Assn. of Tex. v. Timbers of Inwood Forest Associates, Ltd.*, 484 U.S. 365, 371 (1988)).

"When a statute is a part of a larger Act . . . the starting point for ascertaining legislative intent is to look to other sections of the Act *in pari materia* with the statute under review." *McPherson*, 73 M.J. at 395–96 (omission in original) (citation omitted). The CAAF cautions that we have "no license . . . to construe statutes in a way that 'undercut[s] the clearly expressed intent of Congress,'" *id.* at 396 (alteration in original) (citation omitted), but allows that "a court can refuse to apply the literal text of a statute" "in very limited circumstances." *United States v. McPherson*, 81 M.J. 372, 380 (C.A.A.F. 2021).

### f. *"Inactive-duty Training" Status*

As defined both in statute and relevant Rules for Courts-Martial, "inactive-duty training" means:

> (A) duty prescribed for Reserves by the Secretary concerned under [37 U.S.C. § 207] or any other provision of law; and

> (B) special additional duties authorized for Reserves by an authority designated by the Secretary concerned and performed by them on a voluntary basis in connection with the prescribed training or maintenance activities of the units to which they are assigned.

10 U.S.C. § 101(d)(7); *see also* R.C.M. 103(d)(7).

Air Force Manual (AFMAN) 36-2136, *Reserve Personnel Participation*, ¶¶ 4.1.1 and 4.1.2 (6 Sep. 2019),[13] states that the types of IDT include: "Training Period. A period of training, duty, or instruction," and "Unit Training Assembly. A planned period of training, duty, instruction, or test alert completed by an Air Force Reserve Unit." "Inactive Duty Training performed for pay has to prepare a reservist for mobilization." *Id.* at ¶ 4.2.2.

AFMAN 36-2136 also provides guidance for assigning, tracking, and accounting for reserve member participation. Reserve members are considered in a duty status, which makes them subject to the UCMJ, during any point-gaining activity. *Id.* at ¶ 1.91. Points are a unit of measurement that records some forms of a reserve member's participation. *Id.* at ¶ 2.1. Members are awarded one point for each IDT period completed, not to exceed two IDT periods per calendar day. *Id.* at ¶ 2.2. IDTs may include UTAs and other training periods. *Id.* at ¶ 4.1. IDT periods must have advanced authorization from an appropriate authorizing official, must provide adequate and appropriate training, and must be performed either for pay and points or for points only. *Id.* at ¶ 4.2.1. The authorizing official for lDTs is the commander or a representative designated in writing. *Id.* at ¶ 4.4. The UTAPS or an AF Form 40A is used to document performance of IDTs. *Id.* at ¶ 4.12.

### 3. Analysis

#### a. UCMJ Jurisdiction at Time of Offenses

The Government's theory of jurisdiction over Appellant at the time of his offenses relies solely on Article 2(a)(3)(B)(iii), which includes jurisdiction over members of a reserve component who commit offenses during "[i]ntervals between IDTs on consecutive days."[14]

Appellant concedes "there is no dispute that [he] performed IDT on 7 December 2019 and was scheduled to perform IDT on 8 December 2019." However, Appellant asserts that because he never actually performed IDT on 8 December 2019, he did not commit the offenses during "intervals between inactive-duty training on consecutive days, pursuant to orders or regulations."[15]

---

[13] This is the version of the service regulation applicable at the time of Appellant's offenses.

[14] We also considered whether Appellant was subject to UCMJ jurisdiction at the time of his offenses under Article 2(c) which applies to persons "serving with" the armed forces. Applying the analysis of our superior court in *United States v. Phillips*, 58 M.J. 217 (C.A.A.F. 2013), we conclude Article 2(c) is inapplicable to Appellant's case.

[15] Though not dispositive of the jurisdictional question, we note Appellant was apparently under the impression he was subject to UCMJ jurisdiction at the time of his

Appellant bases his contention that he did not perform IDT on 8 December 2019 on his actual activities that day. Specifically, Appellant argues that staying home did not constitute any of the categories of IDT identified in the relevant service regulation, AFMAN 36-2136, and therefore he did not perform IDT on 8 December 2019. We disagree.

AFMAN 36-2136 described several types of creditable IDT, including "Training Period" and "Unit Training Assembly." ¶ 4.1. The descriptions of both "Training Period" and "Unit Training Assembly" include as possible activities "training, *duty*, or instruction." *Id.* (emphasis added). We agree with the military judge's conclusion that "[a]uthorizing a member to remain outside of the work center, with another unit member, because of [concern for Appellant's mental health and general well-being] does not change a member's duty status and is an appropriate command response to the circumstances at the time." Remaining home under military observation during IDT periods was Appellant's lawful duty on 8 December 2019.[16]

We assume it is rarely, if ever, the case that *all* members of a reserve unit do the exact same training, duty, or instruction, at the exact same time, for the entirety of each IDT period during a UTA. For instance, we note that some members of Appellant's unit were detailed to be at Appellant's home during their scheduled IDT periods on 8 December 2019. We are thus unconvinced that the mere fact Appellant was doing some alternative duty in an alternative physical location on 8 December 2019 disqualified him from IDT.

Appellant further argues that "[s]taying at home with another member does not prepare a reservist for mobilization, so it does not qualify to be IDT performed for pay." We reject this argument, which is premised on AFMAN 36-2136, ¶ 4.2.2, which states that "[IDT] performed for pay has to prepare a reservist for mobilization." First, though whether a member is paid for an IDT may be evidence that the member performed IDT, as it is in Appellant's case, an IDT need not be performed "for pay" for jurisdiction to exist. Article 2(a) does not distinguish between paid IDT and IDT performed for "points only." Second, the court assumes that attending to one's mental well-being certainly

---

offenses. Moments after he committed the offenses, while confronting Appellant, a fellow servicemember, TSgt VA, told him, "[Y]ou could be in so much f[**]king trouble for this s[**]t" because "[y]ou both are on military orders . . . ." Appellant acknowledged he understood by saying "um-hmm," and under cross-examination at trial he agreed that "um-hmm" meant he was acknowledging he understood "how much trouble [he] could get in with the military."

[16] We note that though it is unclear when unit supervision of Appellant ended on 8 December 2019, the record is clear that such supervision occurred through at least the first IDT period on that day.

may prepare one for mobilization, and in any event, we decline to substitute our judgment for the unit's assessment of what duty on 8 December 2019 best prepared Appellant for mobilization. We further decline to disregard the substantial documentary evidence and testimony received during the pretrial motion hearing on this issue that: (1) Appellant's 8 December 2019 IDT periods were not excused, unexcused, or rescheduled; (2) per the decision of his unit Appellant remained "in status" on 8 December 2019; and (3) Appellant received pay and points for performing two IDT periods on 8 December 2019.

Appellant performed two IDT periods on Saturday, followed by a party Saturday night after which he sexually assaulted a subordinate Airman in his reserve unit alongside whom he had performed IDT that day and alongside whom he was scheduled to perform IDT hours later. In other words, Appellant's situation is precisely one of the jurisdictional gaps Congress intended to foreclose when amending Article 2(a)(3)(B). Congressional intent is apparent from Congress's adoption of the precise text recommended by the MJRG, which justified its recommendation on concern that misconduct occurring between IDTs could negatively affect good order and discipline in the armed forces. Congress's intent is also clear from the amended text of Article 2(a)(3)(B) itself. Whereas Article 2(a)(3)(B) previously extended military jurisdiction only during the IDT period itself, *Hale*, 78 M.J at 272, in amending Article 2, Congress ensured misconduct bookended by consecutive periods of IDT was subject to UCMJ jurisdiction.

We find the military judge's finding of fact that Appellant performed IDT on 8 December 2019 supported by the record and not clearly erroneous. Accordingly, the early morning hours of 8 December 2019 when Appellant sexually assaulted his fellow reserve member was an interval between inactive-duty training on consecutive days.

Even if we were to find Appellant did not perform IDT on 8 December 2019, we would still find jurisdiction existed over Appellant at the time he committed the offenses. Article 2(a)(3)(B)(iii) establishes jurisdiction over offenses committed by reserve members between inactive-duty training on consecutive days, pursuant to orders or regulations. Article 2(a)(3)(B)(iii) does not qualify or describe "inactive-duty training," including whether such IDT must be "performed," "scheduled," "credited," or some other indication of what is necessary for an inactive-duty training period to suffice for the purpose of establishing jurisdiction.

Appellant contends that jurisdiction over offenses committed during intervals between inactive-duty training on consecutive days is only "perfected" once a member actually performs IDT on the consecutive day after committing the offenses. We reject this interpretation of Article 2(a)(3)(B)(iii), as it would contravene Congress's intent and important principles of jurisdiction.

First, under Appellant's reading, whether jurisdiction exists would be un-known—indeed, unknowable—at the time the offense is committed. An interpretation of Article 2(a)(3)(B)(iii) that permits neither military leaders nor servicemembers to know whether jurisdiction exists at a particular moment in time, and that can only be determined retroactively by later actions, contravenes "[t]he overarching interest implicated by the law of personal jurisdiction . . . the need—of both servicemember and service—to know with certainty and finality what the person's military status is and when that status changes." *United States v. Nettles*, 74 M.J. 289, 291 (C.A.A.F. 2015) (citation omitted). Further, such a reading is inconsistent with Congress's intent to reduce "vagaries inherent in a system whereby jurisdiction over reservists performing [IDT] could—like an office light switch—turn on and off several times during the course of a single work day." *Hale*, 78 M.J. at 275–76 (Ohlson, J., concurring in part and dissenting in part) (footnote and citation omitted).

Second, under Appellant's reading, the *offender* controls whether jurisdiction ultimately attaches. That is, under Appellant's interpretation, if the offender chooses not to perform IDT on the day following commission of the offense—a not-implausible possibility following commission of offenses triable by court-martial—jurisdiction is never "perfected" and therefore did not exist at the time of the offense. There is no legal mechanism to compel a member to perform IDT on any given date. So if, as Appellant argues, the test to determine whether there was an interval between IDTs on consecutive days is whether the accused actually performs the scheduled IDT on the consecutive day following commission of the offense, the member would control whether jurisdiction ultimately attaches. We recognize that a reserve member may control whether to subject themself to the start of military jurisdiction through entering into such a status by traveling to, or performing, an IDT. But we do not believe Congress intended to give reserve members, once they have voluntarily subjected themselves to a status identified in Article 2(a)(3)(B), the ability to unilaterally terminate jurisdiction after they have committed an offense simply by failing to perform the next consecutive scheduled IDT period or scheduled IDT on the next consecutive day. Indeed, such an interpretation is inconsistent with the rationale offered by the MJRG when recommending to Congress the expanded jurisdiction that Congress enacted verbatim: to "enhance good order and discipline in the reserve components of the armed forces by giving *commanders* better disciplinary options to address misconduct that takes place incident to periods of [IDT]." *Report of the Military Justice Review Group* at 155 (emphasis added).

We need not settle on the precise factors to consider in all cases or suggest language with which the body entrusted to "make rules for the [G]overnment and regulation of the land and naval forces," U.S. CONST., art. I, § 8, might clarify its jurisdictional intent. In this case, Appellant performed IDT on 8

December 2019 and therefore jurisdiction existed under Article 2(a)(3)(B)(iii) when Appellant committed the offenses between IDT periods on 7 and 8 December 2019. We further find that even if Appellant had not performed IDT on 8 December 2019, jurisdiction existed under Article 2(a)(3)(B)(iii) at the time he committed the offenses because: (1) pursuant to orders and regulations, he was scheduled to perform IDT on 7 and 8 December 2019; (2) jurisdiction began because he performed IDT on 7 December 2019; (3) at the time he committed the offenses in the early morning hours of 8 December 2019, Appellant remained scheduled to perform IDT on the next day; and (4) at the time he committed the offenses neither Appellant nor his command had communicated or manifested any intent for Appellant to not perform his next scheduled IDT on 8 December 2019.

### b. Status at Preliminary Hearing

Appellant argues that a jurisdictional question was created by Appellant being in an IDT status, rather than on active duty, for his preliminary hearing. Appellant's argument is essentially as follows:

- Article 2 and R.C.M. 204(a) mandate that reserve members be on active duty for Article 32 preliminary hearings; [17]
- because Appellant was not on active duty for the Article 32 preliminary hearing, the hearing was not in substantial compliance with R.C.M. 405;
- no charge or specification may be referred to trial by general court-martial until completion of an Article 32 hearing that is in substantial compliance with R.C.M. 405; and therefore,
- because the charge and specification were improperly referred without an Article 32 hearing in substantial compliance with R.C.M. 405, the general court-martial did not have jurisdiction over the offenses.

Appellant's argument contains multiple fatal flaws.

First, contrary to Appellant's assertion, the law does not require Appellant to be on active duty for the preliminary hearing. Article 32 and its corresponding R.C.M. 405 say nothing about any duty status required of an accused reserve member. Further, neither Article 2 nor R.C.M. 204(a) require that reserve members be on active duty for preliminary hearings. Appellant converts

---

[17] We note that when arguing Appellant's speedy trial motion at trial, defense counsel made the opposite argument Appellant now makes. In his written motion, trial defense counsel asserted: "Neither AFI 51-201, R.C.M. 204, or Article 2 require a reservist to be on active duty orders for preferral, an Article 32, or referral. There are directives outlining the possibility and availability of doing so, but nothing requiring it."

the permissive language of Article 2(d)(1)—"a member of a reserve component *may* be involuntarily ordered to active duty for . . . a preliminary hearing" (emphasis added)—into a requirement that a reserve member be on active duty for a preliminary hearing. 10 U.S.C. § 802(d)(1)(A).

Appellant makes a similar error regarding the Discussion accompanying R.C.M. 204(a). He notes it specifies that service regulations "should describe procedures for ordering a reservist to active duty for disciplinary action, preferral of charges, preliminary hearings, forwarding of charges, referral of charges, designation of convening authorities and commanders authorized to conduct nonjudicial punishment proceedings, and for other appropriate purposes." He then argues that the Discussion's *recommendation* that service regulations be promulgated for these purposes imposes a *requirement* that a reserve member be on active duty for preliminary hearings. Appellant's argument is flawed for three reasons. First, we note the Discussions to the Rules for Courts-Martial are non-binding.[18] Second, Appellant mistakes the suggestive language of the Discussion to R.C.M. 204(a) ("should") for a *requirement*. Third, Appellant misreads R.C.M. 204(a). Contrary to Appellant's argument, the phrase "should describe procedures for" is the series qualifier that modifies each item in the list that follows, not the phrase "should describe procedures for ordering a reservist to active duty for." That is, the only listed item modified by the phrase "for ordering a reservist to active duty for" is "disciplinary action." This reading is demonstrated by context.[19] For instance, service regulations would not "describe procedures for ordering a reservist to active duty for . . . designation of convening authorities and commanders authorized to conduct nonjudicial punishment proceedings."

Appellant's argument also ignores the explicit narrow requirement of R.C.M. 204(b)(1) that a reserve member "must be on active duty prior to *arraignment*." (Emphasis added). That is, the only mandatory language in the Rule for Courts-Martial specifically addressing "[j]urisdiction over certain reserve component personnel" regarding status in the court-martial process is that the member must be on active duty prior to arraignment, a step that

---

[18] "The provisions of a discussion section to the R.C.M. are not binding but instead serve as guidance." *United States v. Chandler*, 80 M.J. 425, 429 n.2 (C.A.A.F. 2021) (citation omitted).

[19] Our reading is also supported by the doctrine of the last antecedent. *See, e.g.*, *Barnhart v. Thomas*, 540 U.S. 20, 26 (2003) ("[A] limiting clause or phrase . . . should ordinarily be read as modifying only the noun or phrase that it immediately follows . . . ."); *United States v. Holt*, No. ACM 40390, 2023 CCA LEXIS 526, at *12 n.5 (A.F. Ct. Crim. App. 14 Dec. 2023) (unpub. op.) (citations omitted), *rev. denied* __ M.J. __, 2024 CAAF LEXIS 196 (C.A.A.F. 1 Apr. 2024); ANTONIN SCALIA & BRYAN A. GARNER, READING LAW: THE INTERPRETATION OF LEGAL TEXTS 59–61, 144 (2012).

comes *after* Article 32 preliminary hearings in the process leading to trial by general court-martial. *See* R.C.M. 204.

Appellant's appearance in IDT status did not render the preliminary hearing in substantial noncompliance with R.C.M. 405, did not render improper referral of the charge to trial by court-martial, and did not obviate the court-martial's jurisdiction.

### c. Jurisdiction at Arraignment and Trial

Appellant's argument that he was not properly recalled to active duty for arraignment and trial has two facets. First, Appellant claims he *could not* be recalled to active duty for trial because the text of Article 2(d)(2)(B) only authorizes general court-martial convening authorities to recall reserve members to active duty for offenses committed when the member was on active duty or IDT.[20] Second, Appellant argues he was not properly recalled to active duty because no AF Form 938 or comparable document was issued, and thus the general court-martial convening authority's "order was not executed, and the process of bringing [Appellant] onto active duty for trial by court-martial was not completed because he did not receive orders." We reject both arguments.

### i) Authority to recall Appellant for court-martial

Appellant argues that Article 2(d)(2) authorizes general court-martial convening authorities to recall reserve members to active duty for purposes of trial only if the subject offenses were committed when the member was on active duty or "on IDT." Appellant asserts that because he was neither on active duty nor "on IDT" when he committed the offenses in the early morning hours of 8 December 2019, the convening authority was not authorized to recall him for trial. Appellant thus contends that when Congress expanded jurisdiction under Article 2(a)(3) to include, *inter alia*, offenses committed during intervals between IDTs on consecutive days, it did not correspondingly expand authorization to involuntarily recall reserve members who committed offenses during these intervals to active duty for trial. *See* National Defense Authorization Act

---

[20] Appellant's defense counsel raised this argument for the first time during the rebuttal portion of oral argument before this court and we subsequently specified briefing of this issue by the parties. The Government contends this issue is not jurisdictional and was thus waived or forfeited. We recognize Appellant did not raise this specific Article 2(d)(2) argument before trial, at trial, in his initial assignments of error brief, or in his reply brief. However, we assume without deciding that the argument is either jurisdictional or sufficiently related to the jurisdictional objection Appellant raised before trial to warrant our consideration here. In any event, we resolve this issue in the Government's favor.

for Fiscal Year 2017 (FY17 NDAA), Pub. L. No. 114-328, §§ 5102, 5542(a), 130 Stat. 2000, 2894–95, 2967 (2016).

"As in all statutory construction cases, we begin with the language of the statute." *McDonald*, 78 M.J. at 379 (quoting *Barnhart*, 534 U.S. at 450). The parties offer competing cannons of statutory interpretation to resolve the meaning of Article 2(d)(2). Appellant cites the "presumption of consistent usage" to assert that "[a] word or phrase is presumed to bear the same meaning throughout a text," quoting ANTONIN SCALIA & BRYAN A. GARNER, READING LAW: THE INTERPRETATION OF LEGAL TEXTS 170 (2012) (alteration in original)) (hereinafter INTERPRETATION OF LEGAL TEXTS). Appellant thus argues the meaning of "on IDT" is the same when that phrase is used in different subsections of Article 2. Under this reasoning, because Article 2(a)(3) plainly distinguishes between being "on IDT" and the periods specified in Article 2(a)(3)(B), the specified periods in Article 2(a)(3)(B) cannot be included within the meaning of being "on IDT" in Article 2(d)(2).

The Government counters that we should apply the "Titles and Headings" cannon of interpretation, under which the titles and headings of a statute are permissible indicators of meaning to resolve doubt about the meaning of a statute. *See Almendarez-Torres v. United States*, 523 U.S. 224, 234 (1998); INTERPRETATION OF LEGAL TEXTS 184–86. The Government observes that in the FY17 NDAA, the revision to Article 2(a)(3)(B), falls under the heading "SEC. CLARIFICATION OF PERSONS SUBJECT TO UCMJ WHILE ON INACTIVE DUTY TRAINING." § 5102, 130 Stat. at 2894. The Government contends the heading in the FY17 NDAA demonstrates that during "intervals between [IDT] on consecutive days," *id.*, servicemembers are "on IDT."

We find both Appellant's and the Government's interpretations would lead to absurd results. The Government's construction lacks logical support. It belies common sense that one can be simultaneously "on IDT" and in an "interval between consecutive periods" of IDT. Moreover, the Government's interpretation would suggest that Article 2(a)(3)(B)'s inclusion of intervals between IDTs is both superfluous to, and conflicts with, Article 2(a)(3)(A)'s establishment of jurisdiction "[w]hile on [IDT] *and* during any of the periods specified in [Article 2(a)(3)(B)]." (Emphasis added).

While in isolation the language of Article 2(d)(2) supports Appellant's argument, this does not end our analysis. "The plainness or ambiguity of statutory language is determined by reference to the language itself, the specific context in which that language is used, and the broader context of the statute as a whole." *Robinson*, 519 U.S. at 341 (citations omitted); *see also Beauge*, 82 M.J. at 162. The ambiguity of "on IDT" in Article 2(d)(2) becomes apparent when considering the broader context of Article 2. The purpose of Article 2(d)(2) is to effectuate UCMJ jurisdiction by empowering general court-martial

convening authorities to involuntarily recall members to active duty for trial by court-martial. As discussed above, Congress clearly intended to expand UCMJ jurisdiction over reserve members with its amendments to Article 2(a)(3). Leaving the ability to effectuate that jurisdiction through recall to active duty for court-martial in only those situations for which there was jurisdiction before Congress's amendment of Article 2(a)(3) results in ambiguity.

Even if we were to find the plain language of Article 2(d)(2) unambiguous, we could not adopt Appellant's interpretation, because doing so would lead to an absurd result. *Lamie*, 540 U.S. at 534 (citations omitted); *Beauge*, 82 M.J. 157 (citation omitted); *Cabuhat*, 83 M.J. at 765.[21]

As noted above, Congress expanded UCMJ jurisdiction to address its concern that misconduct by reserve members occurring between, or when traveling to and from, IDT periods could negatively affect good order and discipline in the armed forces, but was not previously subject to UCMJ jurisdiction. According to Appellant's reading of Article 2, Congress expanded jurisdiction over reserve members—for offenses committed during travel before and after IDT periods, as well as time between consecutive IDT periods on the same day or between IDT periods on consecutive days—by amending the language in Article 2(a)(3)(B), but then precluded convening authorities' ability to effectuate that expanded jurisdiction by failing to include the same expansions in the language of Article 2(d)(2)(B). That result is absurd, and not what Congress intended. Our superior court recently stated, "courts should not reject the plain meaning of a statute if a rational Congress *could have* intended that meaning." *McPherson*, 81 M.J. at 380 (alteration, quotation marks, and citations omitted). But here, a rational Congress could not have amended Article 2(a)(3)(B) to expand jurisdiction while intending that such jurisdiction could not be effectuated absent the member's consent. Theoretically, Congress could have intended to expand jurisdiction while allowing members subject to the expanded jurisdiction provision to decide whether to participate in trial by court-martial. But this would not be rational given Congress's clear intent to close previous jurisdictional loopholes created by periods of IDT service.

An interpretation of Article 2 that would result in Appellant and his sexual assault of a fellow reserve member being subject to UCMJ jurisdiction under Article 2(a)(3)(B), but Appellant not being subject to involuntary recall for court-martial for those offenses under Article 2(d)(3)(B), would "shock general

---

[21] Mindful of our superior court's recent decision in *United States v. Parino-Ramcharan* limiting application of the absurdity doctrine in analysis of scrivener's errors, we conclude the potential error at issue here is a "drafter's error" rather than a "scrivener's error." __ M.J. __, No. 23-0245, 2024 CAAF LEXIS 372, at *10–11 (C.A.A.F. 1 Jul. 2024).

. . . common sense." *McPherson,* 81 M.J. at 380. To avoid this absurd result, we adopt the only permissible meaning that produces a substantive effect that is compatible with the rest of the law. *United Sav. Ass'n of Tex.*, 484 U.S. at 371; *Beauge*, 82 M.J. at 162. We thus interpret Article 2(d)(2)(B) to include all periods specified in Article 2(a)(3)(B) and conclude the general court-martial convening authority had authority to involuntarily recall Appellant for trial by court-martial in this case.

### ii) Whether Appellant was recalled to active duty for trial

Similarly, we reject Appellant's claim that the absence of an AF Form 938 means the convening authority's recall of Appellant to active duty was not executed and thus Appellant was not subject to court-martial jurisdiction. Appellant cites no statute, regulation, or case law for the proposition that an AF Form 938—or, for that matter, any other specific documentation—is required to establish jurisdiction over a member at arraignment and trial. Appellant cites two cases in which this court rejected the argument that administrative errors on an AF Form 938 meant jurisdiction was lacking: *Ferrando*, 77 M.J. at 512, and *United States v. Lull*, No. ACM 39555, 2020 CCA LEXIS 301, at *21 (A.F. Ct. Crim. App. 2 Sep. 2020) (unpub. op.). Appellant argues that those cases are distinguishable because in this case no AF Form 938 was issued at all, but that those cases imply that an AF Form 938 is necessary for purposes of jurisdiction. Stated differently, Appellant argues there is a difference between administrative errors in executing orders to active duty and completely failing to execute or issue such orders.

Neither our opinion in *Ferrando* nor our unpublished opinion in *Lull* establish that an AF Form 938 must be executed for the court-martial to have jurisdiction. In *Ferrando* we held that "[a]n administrative or clerical error committed by the Air Force in properly exercising its statutory jurisdiction over a member does not divest the court-martial of its otherwise lawful jurisdiction . . . ." 77 M.J. at 512. We did not prescribe the form an order to active duty must take. Similarly, in *Lull*, we opined we were "unwilling to hold that an apparent mistake on [the appellant's] AF Form 938 in carrying out the otherwise clear intent of senior Air Force officials to properly recall [the appellant] to active duty warrants a conclusion that jurisdiction is lacking." Unpub. op. at *21. What was essential to our holding that jurisdiction existed in that case was the "clear intent of senior Air Force officials to properly recall [the appellant] to active duty." *Id.*

In another of our previous unpublished opinions regarding this issue, we explicitly opined that AF Form 938s were not the operative documents that recalled the appellant in that case to active duty for court-martial, but rather what ordered appellant to active duty was a "Special Order" that contained nearly the same information as the convening authority's two involuntary

recall memoranda in this case.[22] *United States v. Morse*, No. ACM 33566, 2000 CCA LEXIS 233, at *11 (A.F. Ct. Crim. App. 4 Oct. 2000) (unpub. op.). We held that the special order "complies in every respect with the provisions of Article 2(d)[ ] that provide for the exercise of jurisdiction over reservists." *Id.* at *12.

The flawed premise in Appellant's argument is that Appellant was not issued orders. He was. When a GCMCA with authority over Appellant issued a document stating Appellant "is involuntarily recalled to Active Duty," that document constituted an order to active duty. Moreover, as in *Morse*, here, the convening authority's orders complied in every respect with the provisions of Article 2(d).[23] Appellant was recalled to active duty for trial by general court-martial. *See* 10 U.S.C. § 802(d)(1). As discussed above, Appellant was recalled for offenses committed while he was subject to the UCMJ. *See* 10 U.S.C. § 802(d)(2). Appellant was recalled under regulations prescribed by the President. *See* 10 U.S.C. § 802(d)(3); R.C.M. 204(a); AFI 51-201, ¶ 4.14; AFMAN 36-2136, ¶ 1.9. A regular component GCMCA ordered Appellant to active duty for purposes of arraignment and trial. *See* 10 U.S.C. § 802(d)(4). The Acting SE-CAF approved such recall to active duty, subjecting Appellant to punishment including confinement or other restriction on liberty. *See* 10 U.S.C. § 802(d)(5).

Combined with the Secretarial approval memorandum, the GCMCA's two memoranda served both as evidence of the "clear intent . . . to properly recall Appellant to active duty," *Lull*, unpub. op. at *21, and the effectuation of that intent. By their explicit terms, the memoranda involuntarily recalled Appellant to active duty on dates certain. These orders were communicated to Appellant, as demonstrated by his appearance at arraignment and trial by court-martial. Appellant was on active duty at arraignment and trial and the court-martial had jurisdiction over him.

---

[22] In *Morse*, the relevant recall order stated:

> By direction of the Secretary of the Air Force, the [C]ommander of Fifteenth Air Force, and the Commander of the 932d Airlift Wing . . . , [the appellant] . . . is involuntarily ordered to Extended Active Duty (EAD) effective 9 May 1998 under the following authority: Article 2 and 3 of the Uniform Code of Military Justice (10 U.S.C. [§§ ]802-803), and Air Force Instruction 51-201; for the purpose of disciplinary action which may include confinement . . . .

Unpub. op. at *11–12.

[23] Indeed, the memoranda went beyond complying with the minimum requirements of Article 2(d), UCMJ, and included financial and practical details associated with Appellant's involuntary recall.

**B. Defective Specifications and Legal Insufficiency**

Appellant challenges—for the first time on appeal—the wording of the specifications. Specifically, Appellant contends it was plain error for the specifications to not detail the basis for subject matter jurisdiction over Appellant—that he committed the offenses during an interval between periods of IDT on consecutive days.[24] Building on this contention, Appellant makes the additional argument—also for the first time on appeal—that because the basis for jurisdiction was required to be alleged as part of the specifications, the Government was required to prove with evidence *at trial* the basis for jurisdiction beyond a reasonable doubt. Appellant asserts the Government's failure to do so renders the convictions legally insufficient.

**1. Law**

**a. Defective Specifications**

"[A] charge that is defective because it fails to allege an element of an offense, if not raised at trial, is tested for plain error." *United States v. Ballan*, 71 M.J. 28, 33 (C.A.A.F. 2012) (footnote omitted) (first citing *United States v. Cotton*, 535 U.S. 625, 631–32 (2002); and then citing *United States v. Sinks*, 473 F.3d 1315, 1320–21 (10th Cir. 2007)). For a plain error analysis, an appellant must demonstrate that "(1) there was error; (2) the error was plain and obvious; and (3) the error materially prejudiced a substantial right of the [appellant]." *United States v. Girouard*, 70 M.J. 5, 11 (C.A.A.F. 2011).

Constitutionally sound specifications "give the accused notice [of the charge against which he must defend] and protect him against double jeopardy." *United States v. Turner*, 79 M.J. 401, 403 (C.A.A.F. 2020) (alteration in original) (citing *United States v. Dear*, 40 M.J. 196, 197 (C.M.A. 1994)).

"A flawed specification first challenged after trial . . . is viewed with greater tolerance than one which was attacked before findings and sentence." *United States v. Watkins*, 21 M.J. 208, 209 (C.M.A. 1986) (citations omitted). In the former situation, the specification will be viewed with "maximum liberality." *United States v. Bryant*, 30 M.J. 72, 73 (C.M.A. 1990) (footnote and citations omitted).

Defects in an indictment are not jurisdictional. *Cotton*, 535 U.S. at 631–32.

R.C.M. 307(c)(3) states:

---

[24] Though the subject matter of the language Appellant contends should have been included in the specifications relates to jurisdiction, Appellant does not argue, and we do not find, this assignment of error poses a jurisdictional question. Appellant asserts that even assuming he was subject to jurisdiction at the time of the offenses, the specifications were nevertheless defective and proof at trial was legally insufficient.

> *Specification.* A specification is a plain, concise, and definite statement of the essential facts constituting the offense charged. A specification is *sufficient if it alleges every element of the charged offense* expressly or by necessary implication; however, specifications under Article 134 must expressly allege the terminal element. Except for aggravating factors under R.C.M. 1003(d) and R.C.M. 1004, facts that increase the maximum authorized punishment must be alleged in order to permit the possible increased punishment. No particular format is required.

(Emphasis added). R.C.M. 307(c)(3), Discussion ¶ (G)(i), states "[t]he elements of the offense must be expressly alleged."

R.C.M. 307(c)(3), Discussion ¶ (C)(iv)(b):

> *Persons subject to the UCMJ under Article 2(a), subsections (3) through (12), or subject to trial by court-martial under Articles 3 or 4.* The specification should describe the accused's armed force, unit or organization, position, or status which will indicate the basis of jurisdiction. For example: John Jones, (a person employed by and serving with the U.S. Army in the field in time of war) (a person convicted of having obtained a fraudulent discharge), etc.

The Discussion accompanying the Rules for Courts-Martial "do not constitute rules" and "do not create rights or responsibilities that are binding on any person, party, or other entity (including any authority of the Government of the United States . . .)." *Manual for Courts-Martial, United States* (2019 ed.) (*MCM*), pt. I, ¶ 4, Discussion (citation omitted). "Failure to comply with matter set forth in the [Discussion] does not, of itself, constitute error, although [the Discussion] may refer to requirements in the rules set forth in the Executive Order or established by other legal authorities . . . that are based on sources of authority independent of the [Discussion]." *Id.*

"The provisions of a discussion section to the R.C.M. are not binding but instead serve as guidance." *United States v. Chandler*, 80 M.J. 425, 429 n.2 (C.A.A.F. 2021) (citation omitted); *United States v. Sayers*, No. ACM 40142 (f rev), 2023 CCA LEXIS 199, at *10 (A.F. Ct. Crim. App. 27 Mar. 2023) (unpub. op.) (quoting *Chandler*). "Failure to comply with matter set forth in the [Discussion] does not, of itself, constitute error . . . ." *Id.* Nevertheless, we recognize that in some cases our superior court has cited with approval the non-binding Discussion accompanying the R.C.M. *See, e.g.*, *United States v. Quiroz*, 55 M.J. 334, 337 (C.A.A.F. 2001) (holding that the action of the President in placing the long-standing prohibition of unreasonable multiplication of charges in the Discussion to R.C.M. 307(c)(4) did not have the effect of repealing the

prohibition); *United States v. Buller*, 46 M.J. 467, 468 (C.A.A.F. 1997) (noting the CAAF has sometimes cited with approval the "non-binding Discussion accompanying" R.C.M. 1106(f)(7) (citations omitted)).

### b. Legal Insufficiency

"We review questions of legal sufficiency de novo." *United States v. King*, 78 M.J. 218, 221 (C.A.A.F. 2019) (citing *United States v. Kearns*, 73 M.J. 177, 180 (C.A.A.F. 2014)); *United States v. Knarr*, 80 M.J. 522, 528 (A.F. Ct. Crim. App. 2020) (citing *United States v. Washington*, 57 M.J. 394, 399 (C.A.A.F. 2002)).

The test for legal sufficiency of the evidence is "whether, considering the evidence in the light most favorable to the prosecution, a reasonable factfinder could have found all the essential elements beyond a reasonable doubt." *United States v. Robinson*, 77 M.J. 294, 297–98 (C.A.A.F. 2018). "[I]n resolving questions of legal sufficiency, we are bound to draw every reasonable inference from the evidence of record in favor of the prosecution." *United States v. Barner*, 56 M.J. 131, 134 (C.A.A.F. 2001) (citations omitted).

"Jurisdiction is an interlocutory issue, to be decided by the military judge . . . ." *United States v. Oliver*, 57 M.J. 170, 172 (C.A.A.F. 2002) (citations omitted). When challenged, the Government must prove jurisdiction by a preponderance of the evidence. *Hale*, 78 M.J. at 270; *Oliver*, 57 M.J. at 172.

The applicable provision at the time of Appellant's trial, AFI 51-201, ¶ 4.14.2, stated:

> In any case in which the accused is a member of the Air Force Reserve . . . trial counsel must introduce sufficient evidence to establish in personam (personal) jurisdiction over the accused at the time of the offense. *See United States v. McDonagh*, 14 M.J. 415, 422, 424 (C.M.A. 1983); *United States v. Laws*, 11 M.J. 475, 476–77 (C.M.A. 1981). A member of an Air Reserve Component must be on active duty prior to arraignment at a general or special court-martial.

### 2. Analysis

R.C.M. 307(c)(3) establishes the minimum criterion for a sufficient specification: "A specification is sufficient if it alleges every element of the charged offense expressly or by necessary implication . . . ." Appellant's argument relies

on the non-binding[25] Discussion ¶ (C)(iv)(b) accompanying R.C.M. 307(c)(3), which states that when the basis of jurisdiction is, *inter alia*, Article 2(a)(3) the specification "*should* describe the accused's armed force, unit or organization, position, or status which will indicate the basis of jurisdiction." (Emphasis added). The specifications in this case clearly alleged Appellant's armed force ("United States Air Force"), unit or organization ("924th Aircraft Maintenance Squadron," which is a unit of the Air Force Reserve), and position ("Staff Sergeant"), but did not allege the basis for jurisdiction over Appellant, namely that he committed the offenses during an interval between IDT periods on consecutive days.

Appellant attempts to transform the advisory language of R.C.M. 307(c)(3), Discussion ¶ (C)(iv)(b), into mandatory language. Not only is that incorrect as an interpretive approach, but converting the *recommendation* in R.C.M. 307(c)(3), Discussion ¶ (C)(iv)(b), that the specification "should" include jurisdictional details into a *requirement* would contravene the explicit assertion in R.C.M. 307(c)(3) that a "specification is sufficient if it alleges every element of the charged offense expressly or by necessary implication . . . ." Further, the internal language of the Discussion accompanying R.C.M. 307(c)(3) clearly distinguishes between advisory principles and mandatory requirements. For example, R.C.M. 307(c)(3), Discussion ¶ (G)(i), states "[t]he elements of the offense *must* be expressly alleged." (Emphasis added). In this case, it was not plain error to exclude the jurisdictional details in the specifications in this case because personal jurisdiction, while necessary to bring an accused to trial, is not itself an element of any offense under the UCMJ. *See Oliver*, 57 M.J. at 172.

Even if we were to find plain error, Appellant has not demonstrated prejudice. Appellant contends that because the specifications did not detail the jurisdictional basis, "they did not fully inform [Appellant] of the nature and cause

---

[25] Though we believe the Discussion ¶ (C)(iv)(b) to R.C.M. 307(c)(3) is non-binding, because our superior court, sister courts, and this court have on occasion cited the Discussion accompanying R.C.M. 307 with approval, we include analysis of the Discussion accompanying R.C.M. 307(c)(3) here. *See, e.g.*, *United States v. Quiroz*, 55 M.J. 334, 337 (C.A.A.F. 2001); *United States v. Shafran*, __ M.J. __, No. 1480, 2023 CCA LEXIS 427, at *13 (C.G. Ct. Crim. App. 6 Oct. 2023) (en banc) (citing R.C.M. 307(c)(3), Discussion ¶ (G)(i) with approval regarding what must be alleged and proved); *United States v. Proctor*, No. NMCCA 200601171, 2007 CCA LEXIS 187, at *14 (N.M. Ct. Crim. App. 12 Jun. 2007) (unpub. op.) (considering Discussion accompanying R.C.M. 307(c)(4) "in deciding issues of unreasonable multiplication of charges"); *United States v. Gardner*, No. ACM S30091, 2003 CCA LEXIS 198, at *4 (A.F. Ct. Crim. App. 27 Mar. 2003) (per curiam) (unpub. op.) (relying on R.C.M. 307(c)(3), Discussion ¶ (C)(iv), to conclude no special language is required in a specification to allege a basis of personal jurisdiction for military members on active duty).

of the action as they should have" as required by the Sixth Amendment. Appellant does not explain how reference to his reserve status would inform him of "the nature and cause of the action" or how being less than fully informed in this way injured Appellant. Moreover, as discussed above, the jurisdictional basis for Appellant's court-martial was the subject of extensive pretrial briefing and argument. The purpose of specifications is "to give the accused notice [of the charge against which he must defend] and protect him against double jeopardy." *Turner*, 79 M.J. at 403 (alteration in original) (citing *Dear*, 40 M.J. at 197). Assuming for the sake of argument that R.C.M. 307(c)(3), Discussion ¶ (C)(iv)(b), did *require* the jurisdictional basis to be pleaded in the specification, ostensibly the purpose would be to ensure the accused and court-martial were aware of the Government's theory of jurisdiction, allowing an accused to challenge it. Considering that purpose, Appellant has made no showing that he was prejudiced by the failure of the specifications to include the jurisdictional basis. Appellant was quite aware of the Government's theory of jurisdiction prior to trial and did not lose an opportunity to challenge jurisdiction, as demonstrated by the fact that the issue was fully litigated before arraignment.

Building upon his argument that the specifications were defective, Appellant contends the findings of guilty are legally insufficient because at trial the Government introduced no evidence of Appellant's status at the time of his offenses that subjected him to UCMJ jurisdiction and thus did not prove the basis for jurisdiction beyond a reasonable doubt. Appellant's argument rests entirely on the premise we reject: that the specifications were required to include the jurisdictional basis. Appellant syllogizes that because the basis for jurisdiction is "a necessary element of the specifications [under R.C.M. 307(c)(3), Discussion (C)(iv)(b)], it follows that the [G]overnment needed to introduce evidence to prove this basis for jurisdiction at trial." Appellant then implores that we "should hold that when R.C.M. 307(c)(3) and its accompanying Discussion require specifications to describe the status which indicates the basis of jurisdiction, that basis must also be proven by evidence admitted at trial." We decline Appellant's invitation.

Even if we were to find that under R.C.M. 307(c)(3), Discussion ¶ (C)(iv)(b), specifications *must* (rather than *should*) include the jurisdictional basis in cases like this, we would not extend that requirement to impose a burden on the Government to prove the jurisdictional basis of the offense with evidence admitted at trial for consideration by the factfinder. Doing so would elide the distinction between elements of offenses and jurisdiction and render jurisdiction a question of fact. This distinction between elements and jurisdiction is readily apparent in the very Discussion upon which Appellant relies. As discussed above, R.C.M. 307(c)(3), Discussion ¶ (C)(iv)(b), states that specifications "should" include jurisdictional information while another part of the same Discussion accompanying R.C.M. 307(c)(3), Discussion ¶ (G)(i), states

that the elements of the offense "must" be expressly alleged. The Discussion accompanying R.C.M. 307(c)(3) thus distinguishes between jurisdictional basis and elements, both by discussing them in separate sections of the Discussion and by using different modal verbs with different legal effects to describe their inclusion in specifications. This distinction alone demonstrates the jurisdictional basis is not an element and Appellant's claim of legal insufficiency, which relies solely on R.C.M. 307(c)(3), Discussion ¶ (C)(iv)(b), must fail.

In holding that "[j]urisdiction is an interlocutory issue, to be decided by the military judge, with the burden placed on the Government to prove jurisdiction by a preponderance of the evidence," our superior court has rejected an argument like Appellant's. *Oliver*, 57 M.J. at 172. In *Oliver*, the CAAF granted review of one issue: "whether, in a contested court-martial of a reservist, the [G]overnment must prove sufficient facts to establish subject matter jurisdiction over the alleged offense." *Id.* at 171. There, the appellant was a reserve member of the United States Marine Corps who argued that his status as an individual subject to court-martial jurisdiction was an element of his offense that had to be proved at trial. *Id.* The basis for appellant's argument in *Oliver* was that the punitive article of which he was convicted began with the language "any person subject to this chapter." The CAAF rejected this argument, noting that the successive *Manuals for Courts-Martial* have not historically treated the "any person subject to this chapter" language as an element of the offense. *Id.* at 172. Similarly, the CAAF observed the *Military Judges' Benchbook*, Dept. of the Army Pamphlet 27-9, had never treated the language as an element. *Id.* The CAAF observed that "[t]his longstanding practice underscores the fact that Congress set forth the 'any person' language as a basic jurisdictional prerequisite, not as an element of a particular offense or offenses that are not peculiarly military." *Id.* Likewise, we have found no provision of the UCMJ, the *Manual for Courts-Martial*, or any other authority, that has treated the basis of subject matter jurisdiction over a reserve member as an element of the offense of which Appellant was convicted.

We also have rejected arguments like Appellant's. A previous version of AFI 51-201, ¶ 2.14.2 (18 Jan. 2019, as amended by Air Force Guidance Memorandum 2020-01, 8 Apr. 2020), stated that when the accused is a reserve member, "trial counsel must introduce sufficient evidence to establish *in personam* (personal) jurisdiction over the accused at the time of the offense." We rejected the argument that that provision somehow added "a new element for offenses committed by reservists beyond those defined by Congress in the UCMJ, or detailed by the President in the Manual for Courts-Martial" or "create[d] some additional substantive right for an accused . . . that . . . would generate grounds for appellate relief." *Lull*, unpub. op. at *17 (citing *Gardner*, No. ACM S30091,

2003 CCA LEXIS 198, at *4–5 (A.F. Ct. Crim. App. 27 Mar. 2003) (per curiam) (unpub. op.)).[26]

Acknowledging our decisions in *Lull* and *Gardner*, Appellant does not argue that AFI 51-201, ¶ 2.14.2, imposed a requirement to prove jurisdiction at trial, but instead relies solely on R.C.M. 307(c)(3), Discussion ¶ (C)(iv)(b). Appellant argues that R.C.M. 307(c)(3), Discussion ¶ (C)(iv)(b), is different from a service regulation because an R.C.M. *is* "detailed by the President in the Manual for Courts-Martial," a source that contains elements of offenses.

We are aware of no precedent, and Appellant cites none, that holds that R.C.M. 307(c)(3), Discussion ¶ (C)(iv)(b), imposes an obligation to prove beyond a reasonable doubt the jurisdictional basis over a reserve member at trial. Further, the jurisdictional basis over a reserve member is not identified in the *Manual for Courts-Marial* as an element of any of the offenses under Article 120, UCMJ. Our conclusion is the same as our conclusions in *Lull* and *Gardner* regarding AFI 51-201, ¶ 2.14.2: R.C.M. 307(c)(3), Discussion ¶ (C)(iv)(b), does not create an additional element for offenses committed by reservists beyond those defined by Congress in the UCMJ, or detailed by the President in the Manual for Courts-Martial.

The test for legal sufficiency is "whether, considering the evidence in the light most favorable to the prosecution, a reasonable factfinder could have found all the essential elements [of the charged specifications] beyond a reasonable doubt." *Robinson*, 77 M.J. at 297–98. Because we have found the jurisdictional basis is not an "element" of the offenses of which Appellant was convicted, the Government was not required to prove the basis for jurisdiction over Appellant beyond a reasonable doubt to the trier of fact for his convictions to be legally sufficient.

## C. Speedy Trial

### 1. Additional Background

Appellant claims his rights to speedy trial under R.C.M. 707 and the Sixth Amendment were violated when the special court-martial convening authority initially dismissed the Charge and specifications without prejudice shortly

---

[26] The version of this regulation applicable at the time of Appellant's court-martial stated the requirement differently: "In [Air Reserve Component] member cases, trial counsel must *be prepared to* introduce sufficient evidence to establish in personam (personal) jurisdiction over the accused at the time of the offense." Department of the Air Force Instruction (DAFI) 51-201, *Administration of Military Justice*, ¶ 3.7.1.1 (14 Apr. 2022) (emphasis added) (citations omitted). This language clearly removed any requirement on the part of trial counsel to introduce evidence of personal jurisdiction that might have been perceived in the prior version of DAFI 51-201.

before the R.C.M. 707 120-day "clock" ran out and Appellant was not ultimately arraigned until over a year later.

On 1 August 2020, the Charge and its three specifications were initially preferred against Appellant. On 14 August 2020, Appellant demanded speedy trial. An Article 32 hearing occurred on 25 September 2020. The preliminary hearing officer submitted her report to the special court-martial convening authority (SpCMCA) on 21 November 2020. On 11 December 2020, the SpCMCA dismissed the initial charge and its three specifications without prejudice. In a separate document signed the same day, the SpCMCA excluded 25 days from R.C.M. 707 speedy trial calculation for time required to process Appellant onto active duty and because of defense unavailability. On 26 January 2021, per Article 2(d)(5), the GCMCA initiated a request to the SECAF to approve recalling Appellant to active duty for the purpose of trial to preserve the possibility of confinement if Appellant was convicted at court-martial. On 3 June 2021, the Acting SECAF granted the GCMCA's request. On 20 October 2021, the Charge and its specifications were preferred for a second time and, on 19 November 2021, were referred to trial. The Charge and its specifications were unchanged in the second preferral from the first preferral.

On 7 December 2021, Appellant made his second speedy trial demand. On the same day, the Chief Trial Judge of the Air Force issued a "Confirmation of 'Arraignment and Initial Trial Dates'" memorandum, in which he noted key dates, including 20 October 2021 as the date of preferral, excluded 78 days from speedy trial computations under R.C.M. 707, and docketed the case for arraignment and motions on 21 March 2022 and trial on 27 June 2022. In this memorandum, the Chief Trial Judge identified 3 January 2022 as the date the Government was ready to proceed to trial and 31 May 2022 as the date defense counsel were ready to proceed to trial. Despite having previously asserted defense counsel's unavailability for trial until 31 May 2022, on 3 February 2022 Appellant made his third speedy trial demand. Appellant was arraigned on 22 March 2022. At this time, 598 total days had elapsed since the initial preferral of the Charge and its specifications on 1 August 2020. Based on time excluded by the Chief Trial Judge, Appellant was arraigned in less than 120 countable days from the second preferral. Trial began on 27 June 2022.

During the pretrial hearing on Appellant's motion to dismiss due to the asserted speedy trial violation, neither the SpCMCA nor anyone else testified as to the reason for the dismissal of the Charge and its specifications on 11 December 2020. The memorandum in which the SpCMCA dismissed the Charge and its specifications did not offer a rationale, stating only "Pursuant to the advice of my staff judge advocate, I hereby direct that the Charge and its [s]pecifications be dismissed, without prejudice, in the case of [*United States v. Taylor*]." In a 19 January 2021 legal review of the request that SECAF recall

Appellant to active duty, the SpCMCA's staff judge advocate stated the following regarding why the Charge and specifications were dismissed:

> Recognizing [Appellant's] right under [R.C.M.] 707 to be arraigned within 120 days of preferral of charges, on 11 December 2020, the [SpCMCA] dismissed the Charge and its [s]pecifications, without prejudice. The Charge and its [s]pecifications will be re-preferred upon approval of the request for recall to active duty by the Secretary of the Air Force.

On the key question of the 11 December 2020 dismissal of the Charge and its specifications by the SpCMCA, the military judge made the following finding of fact:

> Based on the evidence presented and the agreement of the parties, this [c]ourt finds as fact that the reason for the [11 December 2020] dismissal without prejudice was to allow the convening authority to seek SECAF approval of [Appellant's] recall to active duty, in order to preserve the possibility of confinement in this case.

In ruling that Appellant's R.C.M. 707 speedy trial right had not been violated, the military judge further found:

> There is no evidence that the convening authority withdrew the [C]harge[ ] for the sole purpose of evading the 120-day clock. Instead, the dismissal was done for the legitimate, command purpose of obtaining SECAF approval of [Appellant's] recall to active duty, in order to preserve confinement as a potential punishment if [Appellant] is convicted of any of the charged offenses. The convening authority did not dismiss the originally preferred charge as a subterfuge to avoid speedy trial concerns . . . .

(Citation omitted).

### 2. Law

"We review the decision of whether an accused has received a speedy trial de novo as a legal question, giving substantial deference to a military judge's findings of fact that will be reversed only if they are clearly erroneous." *United States v. Harrington*, 81 M.J. 184, 188–89 (C.A.A.F. 2021) (quoting *United States v. Mizgala*, 61 M.J. 122, 127 (C.A.A.F. 2005)); *see also United States v. Heppermann*, 82 M.J. 794, 803 (A.F. Ct. Crim. App. 2022) (reviewing an R.C.M. 707 speedy trial claim de novo, and finding the military judge's findings of fact were not clearly erroneous) (citation omitted), *rev. denied*, 83 M.J. 103 (C.A.A.F. 2022). "A finding of fact is clearly erroneous when 'there is no evidence to support the finding' or when 'although there is evidence to support it,

the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed.'" *Harrington*, 81 M.J. at 189 (citation omitted).

"[U]nless the order to active duty was approved by the Secretary concerned," a reserve component member "may not . . . be sentenced to confinement." Article 2(d)(1), (5)(A), UCMJ.

### a. R.C.M. 707

Servicemembers tried by courts-martial have multiple sources of a right to a speedy trial, including R.C.M. 707. Under the relevant portion of R.C.M. 707, an accused must be brought to trial within 120 days of preferral of charges. R.C.M. 707(a)(1); *United States v. Hendrix*, 77 M.J. 454, 456 (C.A.A.F. 2018). When the accused is not under pretrial restraint at the time charges are dismissed, a new 120-day period begins "the date on which charges are preferred anew," R.C.M. 707(b)(3)(A)(ii)(I), unless charges are dismissed for an "improper purpose or for subterfuge," in which case the 120-day clock runs from the date of the original preferral. R.C.M. 707(b)(3)(A)(iii); *see also United States v. Guyton*, 82 M.J. 146, 151 (C.A.A.F. 2022) ("Ordinarily, when an accused is not under pretrial restraint and charges are dismissed, a new 120-day time period begins on the date of repreferral."); *Hendrix*, 77 M.J. at 457 ("If charges are dismissed and then repreferred, a new 120-day period begins from the date of repreferral."); *United States v. Leahr*, 73 M.J. 364, 369 (C.A.A.F. 2014) ("Absent a situation where a convening authority's express dismissal is either a subterfuge to vitiate an accused's speedy trial rights, or for some other improper reason, a clear intent to dismiss will be given effect." (citations omitted)); *United States v. Tippit*, 65 M.J. 69, 79 (C.A.A.F. 2007) ("[O]nce charges are dismissed, absent a subterfuge, the speedy-trial clock is restarted." (alteration in original) (quoting *United States v. Anderson*, 50 M.J. 447, 448 (C.A.A.F. 1999))). In *Leahr*, the CAAF defined a proper reason (in the context of a discussion of R.C.M. 604, which governs withdrawal of charges from court-martial) as "a legitimate command reason which does not 'unfairly' prejudice an accused." 73 M.J. at 369 (citation omitted).

"[T]ime to process a member of the reserve component to active duty for disciplinary action" is explicitly recognized as a reason to grant a delay. R.C.M 707(c)(1), Discussion.

When a term is not statutorily defined, we accord it its ordinary meaning. *United States v. Pease*, 75 M.J. 180, 184 (C.A.A.F. 2016).

### b. Sixth Amendment

"In all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial . . . ." U.S. CONST. amend VI. We determine whether an appellant has been denied his right to a speedy trial using the four-factor test the

United States Supreme Court established in *Barker v. Wingo*, 407 U.S. 514 (1972). *Harrington*, 81 M.J. at 189. The four *Barker* factors are: "(1) the length of the delay; (2) the reasons for the delay; (3) whether the appellant made a demand for a speedy trial; and (4) prejudice to the appellant." *Id.* (citation omitted). Unless the length of delay is facially unreasonable, the full due process analysis will not be triggered. *United States v. Danylo*, 73 M.J. 183, 186 (C.A.A.F. 2014). None of the four factors in *Barker* is regarded as either a necessary or sufficient condition to the finding of a deprivation of the speedy trial right. *Barker*, 407 U.S. at 533. Instead, they are related factors and must be considered together with such other circumstances as may be relevant. *Id.* In sum, the factors have no talismanic qualities; courts must still engage in a difficult and sensitive balancing process. *Id.*

Regarding the fourth *Barker* factor, prejudice to the appellant, we consider "three similar interests . . . (1) prevention of oppressive incarceration pending appeal; (2) minimization of anxiety and concern of those convicted awaiting the outcome of their appeals; and (3) limitation of the possibility that a convicted person's grounds for appeal, and [his] defenses in case of reversal and retrial, might be impaired." *Danylo*, 73 M.J. at 188 (quoting *United States v. Moreno*, 63 M.J. 129, 138–39 (C.A.A.F. 2006)). "The most serious factor in analyzing the prejudice factor is evaluating the ability of an appellant to assert . . . [his] defense in the event of a retrial or resentencing." *Moreno*, 63 M.J. at 148 (citations omitted). This form of prejudice is the most serious because it "'skews the fairness of the entire system.'" *Id.* at 147 (quoting *Barker*, 407 U.S. at 532).

"In military prosecutions, the accused's Sixth Amendment speedy trial protections are generally triggered when charges are preferred." *Harrington*, 81 M.J. at 189 (footnote omitted) (citing *Danylo*, 73 M.J. at 186). While arraignment stops the speedy-trial clock for purposes of R.C.M. 707, trial stops the clock for Article 10, UCMJ, and Sixth Amendment purposes. *United States v. Wilder*, 75 M.J. 135, 138 (C.A.A.F. 2016) (footnote and citations omitted). "Delays attributable to [an accused] do not weigh in favor of a Sixth Amendment violation." *United States v. Wilson*, 72 M.J. 347, 352 (C.A.A.F. 2014) (citation omitted).

Where charges are dismissed for a "valid reason," the speedy trial guarantee of the Sixth Amendment is inapplicable to the period between the dismissal and subsequent re-preferral of charges. *See, e.g., Guyton*, 82 M.J. at 154 n.7 (citing *United States v. MacDonald*, 456 U.S. 1, 7 (1982) (holding "the [Sixth Amendment] Speedy Trial Clause has no application after the Government, acting in good faith, formally drops charges" in a case where there was a four-year delay between charges being dropped and new charges being brought))); *United States v. Arnold*, No. ACM 39194, 2018 CCA LEXIS 322, at *26–27 (A.F. Ct. Crim. App. 27 Jun. 2018) (unpub. op.) (stating when Government re-

preferred the charges in good faith, speedy trial provision of the Sixth Amendment was inapplicable to the period between the dismissal and subsequent re-preferral (citations omitted)); *United States v. Amerine*, 17 M.J. 947, 950 (A.F.C.M.R. 1984) ("Where the Government withdraws charges in good faith, the speedy trial provision of the Sixth Amendment is inapplicable to the period between the withdrawal of the charges and a subsequent re-preferral of those charges." (citation omitted)).

### 3. Analysis

#### a. R.C.M. 707

Appellant argues the dismissal of the Charge and its specifications on 11 December 2020 was a subterfuge for an improper purpose and therefore the R.C.M. 707 120-day speedy trial clock continued to run from the initial preferral of charges on 1 August 2020 until Appellant was arraigned on 22 March 2022. If Appellant's view is correct, the time between preferral and arraignment greatly exceeded 120 days, even after subtracting time excluded by the SpCMCA and military judge.

At trial, the military judge found as fact that "the reason for the [11 December 2020] dismissal without prejudice was to allow the convening authority to seek SECAF approval of [Appellant's] recall to active duty, in order to preserve the possibility of confinement in this case." Having reviewed the entire record, and giving "substantial deference" to the military judge's finding of fact, which was based on the available evidence and agreement of the parties at trial, we conclude the military judge's finding of fact was not clearly erroneous. *Harrington*, 81 M.J. at 189; *Heppermann*, 82 M.J. at 803.

We now examine whether "dismissal without prejudice . . . to allow the convening authority to seek [SECAF] approval of [Appellant's] recall to active duty, in order to preserve the possibility of confinement" was "for an improper purpose or for subterfuge." R.C.M. 707(b)(3)(A)(iii); *see also Hendrix*, 77 M.J. at 457 ("Absent a situation where a convening authority's express dismissal is either a subterfuge to vitiate an accused's speedy trial rights, or for some other improper reason, a clear intent to dismiss will be given effect.").

Both parties claim support for their positions in our superior court's opinion in *Tippit*. In *Tippit*, the CAAF assessed a factual scenario in some ways like the one presented in this case. There, the accused was a reserve member suspected of sexual misconduct. Charges were initially preferred against the accused and an Article 32 hearing held. After the Article 32 hearing, additional potential misconduct was discovered and there was at least some indication that the prosecuting legal office recognized its failure to obtain SECAF approval of the accused's initial recall to active duty. The convening authority then dismissed the charges. Following dismissal, SECAF approval of the

accused's recall to active duty was requested and the additional offenses investigated. Once the additional investigation was completed and SECAF approval of the accused's recall to active duty was obtained, the original offenses and additional offenses were preferred and referred against the accused. At trial, the defense raised a speedy trial motion under R.C.M. 707, claiming that the R.C.M. 707 speedy trial clock continued to run from the initial preferral date, in part because the Government dismissed the charges as a subterfuge to allow time for Secretarial approval of the recall order. The trial judge held that the dismissal was for the legitimate purpose of allowing completion of the ongoing investigation into the additional offenses. The appellant then pleaded guilty. On appeal, appellant alleged ineffective assistance of his trial defense counsel for allowing him to waive the R.C.M. 707 motion. *Id.* at 71–74.

In assessing the prejudice prong of appellant's ineffective-assistance claim in *Tippit*, our superior court found that the military judge did not err in his findings of fact or conclusions of law and that the appellant would not have prevailed on his R.C.M. 707 claim, even if the issue had not been waived. *Id.* at 77. The CAAF also stated "[e]ven if the desire to obtain Secretarial approval [for the recall of a reserve member to active duty to face trial by court-martial] was a matter considered by the [staff judge advocate] or convening authority [for dismissal of charges], that would not establish that the command took such action as a subterfuge to evade the R.C.M. 707 speedy trial clock." *Id.* at 80. Here, the Government contends that language demonstrates the SpCMCA's dismissal of charges for the purpose of securing SECAF approval of a recall for the purpose of preserving the possibility of confinement is not subterfuge.

Appellant reads *Tippit* differently, arguing that the language was merely the CAAF's recognition that the desire to obtain Secretarial approval for recall was secondary and did not taint the primary purpose for the dismissal, which was to allow investigation of additional alleged misconduct. Appellant points to the CAAF's discussion of the appellant's claim that the reason for dismissal of charges was to seek Secretarial approval for recall to active duty. Our superior court said:

> [T]he defense has not demonstrated that the charges were dismissed . . . for the purpose of providing a sufficient opportunity to obtain Secretarial approval prior to expiration of the 120-day speedy trial clock. . . . [T]he defense has not shown that anyone in authority had determined that the remaining period on the clock was insufficient to obtain Secretarial approval. Under the foregoing circumstances, [the a]ppellant has not established that the "real reason" the convening authority disposed of the charges . . . was the failure to obtain Secretarial approval.

*Id.* Appellant suggests that had the defense in *Tippit* demonstrated the charges were dismissed for the sole purpose of providing an opportunity to obtain Secretarial approval that could not be obtained prior to expiration of the 120-day speedy trial clock, the appellant in *Tippit* might have prevailed on his speedy-trial claim. The import of this interpretation to Appellant's case is clear: in Appellant's case, the evidence is plain that the "real reason" the charge and specifications were dismissed was for the purpose of obtaining Secretarial approval for recall to active duty for the purpose of preserving the possibility of confinement under Article 2(d)(5). And the SpCMCA's staff judge advocate's own words confirm the decision was made with the 120-day clock in mind: "Recognizing [Appellant's] right under [R.C.M.] 707 to be arraigned within 120 days of preferral of charges the [SpCMCA] dismissed the Charge and its [s]pecifications, without prejudice . . . ."

In our view, the discussion in *Tippit* cited by the Government and Appellant does not wholly support either party's claims. Our superior court's holding that the dismissal of charges was neither subterfuge nor improper was based on the investigation of new accusations of misconduct in that case; its discussion of dismissal to obtain Secretarial approval was not essential to its holding. Additionally, in *Tippit*, our superior court did not reach the critical question of law at issue in Appellant's case: whether dismissal for the purpose of obtaining Secretarial approval for recall to active duty prior to expiration of the 120-day speedy trial clock constitutes a subterfuge or improper purpose. Indeed, in affirming our decision in *Tippit*, the CAAF did not address our conclusion that "it was proper to seek Secretarial approval to recall the appellant to active duty. These concerns served legitimate command purposes." *United States v. Tippit*, No. ACM 35624, 2006 CCA LEXIS 186, at \*20 (A.F. Ct. Crim. App. 14 Jul. 2006) (unpub. op.), *aff'd, Tippit*, 65 M.J. at 82. Rather, in *Tippit*, the CAAF determined only that the appellant had not sufficiently established—as a matter of fact—that the "real reason" the charge and specifications were dismissed was for the purpose of obtaining Secretarial approval for recall to active duty and did not reach the legal question. We note that our superior court has more recently observed that a subsequent decision "elaborate[d] on our statement in *United States v. Tippit* that '[o]nce charges are dismissed, absent a subterfuge, the speedy-trial clock is restarted.'" *Hendrix*, 77 M.J. at 457 (second alteration in original) (quoting *Leahr*, 65 M.J. at 79). Finally, we note that when our superior court decided *Tippit*, the rule that subterfuge could keep the 120-day clock running despite dismissal of charges was "judicially created," as the effect of subterfuge or improper purpose was not yet included in R.C.M. 707. *Hendrix*, 77 M.J. at 457 n.3.

Mindful of *Tippit*, we assess the issue in this case applying the legal standard our superior court more recently expressed in *Leahr* and reiterated in *Hendrix*: "Absent a situation where a convening authority's express dismissal is

either a subterfuge to vitiate an accused's speedy trial rights, or for some other improper reason, a clear intent to dismiss will be given effect." *Leahr*, 73 M.J. at 369 (citations omitted); *see also Hendrix*, 77 M.J. at 457 (citation omitted).

The Rules for Courts-Martial do not define "subterfuge." When a term is not statutorily defined, we accord it its ordinary meaning. *Pease*, 75 M.J. at 184. Our superior court has applied the Merriam-Webster definition of the term "subterfuge": "deception by artifice or stratagem in order to conceal, escape, or evade." *See Hendrix*, 77 M.J. at 457 (quoting *United States v. Hendrix*, No. ARMY Misc. 20170439, 2017 CCA LEXIS 769, at *7 (A. Ct. Crim. App. 14 Dec. 2017) (unpub. op.)). The CAAF's application of this standard has clearly focused on the deceptive aspect of subterfuge. For instance, in *Hendrix*, the CAAF reasoned it could find no subterfuge

> because there is no indication the Government was engaged in any sort of deception or dismissed the charges with the intention of evading or escaping the 120-day clock. To the contrary, the Government appears to have behaved as if they were dismissing for the exact reasons they indicated . . . .

77 M.J. at 457.

We find no "deception, artifice, or stratagem" by the Government in initially dismissing the Charge and its specifications in this case. The Government has consistently and openly acknowledged the convening authority did so to obtain Secretarial approval of a recall to active duty for trial to preserve the possibility of confinement. The legal review by the convening authority's staff judge advocate acknowledges the decision to dismiss the Charge while obtaining Secretarial approval was made knowing Appellant had a speedy trial right to not have a preferred charge hanging over his head for more than 120 days while the long process of obtaining Secretarial approval unfolded. But awareness that Secretarial approval could not be obtained within the remaining time "on the speedy trial clock" did not transform the need to obtain Secretarial approval into a subterfuge in this case any more than it did in *Hendrix*. There, our sister court held there was no subterfuge when the "driving force" behind dismissing and re-preferring charges was the changing willingness of a victim to participate in the trial, even though the stated purpose of the dismissal without prejudice was "to stop the clock and preserve the ability to prosecute at a later time." *Hendrix*, unpub. op. at *8.

Two of our sister courts have held that a "convening authority's dismissal of a charge is only a subterfuge when the *sole purpose* of the dismissal is to avoid the running of the 120-day speedy trial clock." *United States v. Robison*, No. ARMY 20110758, 2011 CCA LEXIS 381, at *4 (A. Ct. Crim. App. 2 Dec. 2011) (unpub. op.) (emphasis added) (citing *United States v. Robinson*, 47 M.J.

506, 511 (N.M. Ct. Crim. App. 1997)); *see also Hendrix*, 2017 CCA LEXIS 769, at *9 ("Appellate courts look to whether the dismissal itself was a subterfuge—whether the 'sole purpose of the dismissal' was to reset the 120-day clock." (citing *Robison*, unpub. op. at *4). In Appellant's case the Government dismissed the Charge and its specifications, then pursued a fundamental altering of the legal landscape of the ultimate trial by obtaining Secretarial approval to allow confinement to be adjudged, a process that took several months. Under the circumstances, we cannot conclude the dismissal was for the sole purpose of avoiding the running of the 120-day speedy trial clock. This is not a situation where "R.C.M. 707(a) would become meaningless and the protection of R.C.M. 707 would effectively be eliminated" because the "convening authority dismisses preferred but unreferred charges solely to reset the clock" or where a convening authority could repeatedly "dismiss preferred but unreferred charges on day 119 of the speedy-trial clock just to reset the clock." *Robinson*, 47 M.J. at 510.[27] Rather, it is more like cases in which charges were dismissed to allow the Government the opportunity to take a legitimate additional legal action. *See, e.g., Hendrix*, 77 M.J. 454 (dismissing to investigate additional legal misconduct); *United States v. Macario*, No. ARMY 20160760, 2018 CCA LEXIS 494 (A. Ct. Crim. App. 12 Oct. 2018) (per curiam) (mem.) (dismissing to re-prefer charges against accused individually rather than jointly with another servicemember). In this case, avoiding the 120-day speedy trial clock was not the sole, or even primary, purpose for dismissing the charge and specifications.

Finding no subterfuge, the question remains whether the dismissal was for an "improper purpose." We conclude it was not. The SpCMCA did not dismiss charges for the purpose of vitiating Appellant's speedy trial rights. We accord due deference to the military judge's finding of fact that the charge and specifications were dismissed for the "purpose of obtaining SECAF approval of [Appellant's] recall to active duty, in order to preserve confinement as a potential punishment if [Appellant] is convicted of any of the charged offenses," and evaluate whether that purpose is improper.

The Discussion accompanying R.C.M. 707(c)(1) explicitly recognizes "[t]ime to process a member of the reserve component to active duty for disciplinary action" as a basis for granting excludable delay for speedy trial purposes. Time necessary to obtain Secretarial approval to recall Appellant to active duty for

---

[27] We find this case readily distinguishable from *Robinson*. There, our sister court held that dismissal of a charge and its specifications was a subterfuge when it occurred on day 120 (115th chargeable day), was followed 5 days later by re-preferral of essentially identical specifications, the accused was notified the first charge had been dismissed at the same time a "new" charge was preferred against him, there was "no practical interruption in the pending charge and specifications," and "no real change in the legal status of the appellant during that 5-day period." *Robinson*, 47 M.J. at 510.

court-martial could thus hardly be viewed as an *improper* purpose. The Discussion also demonstrates that the convening authority could simply have excluded all the time required to obtain Secretarial approval. The fact that the convening authority could have unilaterally avoided the R.C.M. 707 speedy trial concerns altogether by excluding the time rather than by dismissal supports the Government's contention that evading the speedy trial clock was not the sole purpose of dismissing the Charge and specifications. At the time the SpCMCA dismissed them, the Charge and its specifications had not yet been forwarded to the GCMCA. Importantly, it was not yet known whether the SECAF would approve the request to recall Appellant to active duty. Without Secretarial approval, confinement would not have been an authorized punishment for the serious offenses, including sexual assault, of which Appellant was accused. Thus, at the time the Charge and its specifications were dismissed, it was possible the Charge and its specifications may not have been re-preferred at all. For instance, had Secretarial approval not been obtained, relevant authorities may have chosen another disposition altogether. With such an undetermined legal landscape, it was not an improper purpose to dismiss the Charge and its specifications to await the outcome of the request for Secretarial approval, even if the intention was to re-prefer if such approval was obtained.

As the military judge found, the Charge and its specifications were dismissed for the purpose of obtaining Secretarial approval to recall Appellant to active duty. Under the circumstances of this case, we find this purpose to be proper and the dismissal was not a subterfuge or improper. The R.C.M. 707(a) clock "reset" upon dismissal of the initially preferred charge and specifications and did not start again until the Charge and its specifications were preferred on 20 October 2021. Appellant was arraigned in fewer than 120 "countable" days after preferral. There was no R.C.M. 707 speedy trial violation in Appellant's case.

### b. Sixth Amendment

Appellant argues his Sixth Amendment right was violated and thus the dismissal of the Charge and its specifications necessitated by his claimed R.C.M. 707 speedy trial violation should have been with prejudice. Though we have concluded there was no R.C.M. 707 speedy trial violation, because Appellant further contends his Sixth Amendment right to speedy trial was violated independent of his R.C.M. 707 claim, we evaluate it here. We apply the four factors set forth in *Barker*: (1) the length of the delay; (2) the reasons for the delay; (3) whether the accused made a demand for speedy trial; and (4) prejudice to the accused. 407 U.S. at 530.

Having found the initial preferred Charge and its specifications were dismissed for a legitimate purpose, our analysis of Appellant's Sixth Amendment

speedy trial claim begins with the 20 October 2021 preferral of the Charge and its specifications. *See, e.g., MacDonald*, 456 U.S. at 7; *Guyton*, 82 M.J. at 154 n.7 (citation omitted); *Arnold*, unpub. op. at *26–27; *Amerine*, 17 M.J. at 950. The length of time between this second preferral of the Charge and its specifications and the trial date was 250 days, less 147 days attributable to defense delays due to unavailability for trial, leaving a total of 103 days attributable to the Government. The delay attributable to the Government was thus less than the 120-day requirement under R.C.M. 707, which we view as an "an indication of the amount of pretrial delay that is ordinarily tolerable in a military context." *Guyton*, 82 M.J. at 154 (quoting *United States v. Grom*, 21 M.J. 53, 56 n.4 (C.M.A. 1985)). Moreover, the defense delay constituted the larger share of the delay from preferral to trial. Though we find the length of delay weighs in the Government's favor and does not necessarily trigger further analysis, *Danylo*, 73 M.J. at 186, we nevertheless continue the *Barker* analysis.

There is little evidence in the record to explain delays between the 20 October 2021 preferral and trial. On 7 December 2021, the Chief Trial Judge docketed pretrial motions and arraignment for 21 March 2022 and trial to begin 27 June 2022. According to the Chief Trial Judge's docketing memorandum, as of 7 December 2021, trial defense counsel was apparently unavailable for trial until 31 May 2022. The reasons for Government delay are unclear in the record, and particularly confounding in light of the amount of time the Government ostensibly had to prepare prior to this second preferral. That said, the defense delay constituted the larger share of the delay from preferral to trial. We find the reasons for delay only slightly favor Appellant.

We find the third *Barker* factor weighs in neither party's favor. Following the second preferral of charges, Appellant demanded speedy trial twice, but both demands were somewhat hollow, and at best conveyed mixed signals. His first demand was filed on 7 December 2021, the same date the Chief Trial Judge issued the docketing memorandum that indicated defense counsel was not ready for trial until 31 May 2022, less than one month before trial actually commenced. Appellant's next demand for speedy trial was submitted on 3 February 2022, several weeks before the already-scheduled date for arraignment, and with no apparent change in trial defense counsel's unavailability for trial through 31 May 2022. Under the circumstances, we find this factor weighs in neither party's favor.

Finally, we conclude Appellant suffered no prejudice due to the 250-day delay, including the 103-day delay attributable to the Government. Appellant bears the burden of establishing prejudice from an alleged speedy trial delay. *Danylo*, 73 M.J. at 189. Prejudice is assessed "in the light of the interests of defendants which the speedy trial right was designed to protect." *Barker*, 407 U.S. at 532. The Supreme Court has identified three such interests: "(i) to

prevent oppressive pretrial incarceration; (ii) to minimize anxiety and concern of the accused; and (iii) to limit the possibility that the defense will be impaired." *Id.* The Supreme Court has clarified that

> the Sixth Amendment right to a speedy trial is . . . not primarily intended to prevent prejudice to the defense caused by passage of time; that interest is protected primarily by the Due Process Clause and by statutes of limitations. The speedy trial guarantee is designed to minimize the possibility of lengthy incarceration prior to trial, to reduce the lesser, but nevertheless substantial, impairment of liberty imposed on an accused while released on bail, and to shorten the disruption of life caused by arrest and the presence of unresolved criminal charges.

*MacDonald*, 456 U.S. at 8.

Appellant was not subject to pretrial incarceration or restriction on liberty.

To constitute prejudice, an accused must suffer "particularized anxiety and concern greater than the normal anxiety and concern" associated with a pending trial. *Wilson*, 72 M.J. at 354. On appeal, the only anxiety and concern Appellant argues he suffered due to the delay of his trial is that he did not have an two-week annual tour (AT) in 2021.[28] Appellant argues that he was thus unable to fulfill the requirements of his reserve contract and he was harmed financially due to the income lost from not having an AT. However, Appellant failed to demonstrate that the reason he did not perform an annual tour in 2021 was due to Government delay after preferral on 20 October 2021.[29]

Similarly, Appellant has not demonstrated that the post-preferral delay attributable to the Government, which was shorter than the delay attributable to Appellant, impaired his defense. Appellant contends that Government delay impaired his defense by "causing witnesses to be unable to recall the events in

---

[28] In support of his pretrial motion alleging a speedy trial violation, Appellant attached a memorandum for record signed by Appellant. The memorandum detailed various additional ways in which he was negatively impacted by perceived delays, including a purported child custody issue. However, Appellant withdrew the memorandum before the military judge considered Appellant's motion. On appeal, Appellant does not argue any anxiety or concern other than the fact he did not perform his mandatory two-week AT in 2021.

[29] In light of our decision regarding Appellant's R.C.M. 707 claim, the Government delay we consider ran from 20 October 2021 until 3 January 2022 and 31 May 2022 until trial commenced on 27 June 2022. This means in 2021, the year in which Appellant complains he could not perform his annual tour, just over two months was attributed to Government delay. Further, evidence that Appellant would have performed his annual tour in 2021 but for the Government's post-preferral delay is scant.

question." In support of this argument, Appellant refers only to the fact that AG—his victim—was unable to recall the answers to some questions during cross-examination. Appellant has not shown that AG's inability to recall the answers was attributable to Government delay or demonstrated that her answers would have benefited Appellant. Instead, Appellant asserts only that "[h]ad the case advanced to trial more quickly, it is possible she would have remembered more of these things . . . ." Appellant offers no further examples of witnesses whose incomplete memories impaired his defense, though we note that some Government witnesses were unable to recall the answer to every question, including in instances where lack of memory was potentially to Appellant's benefit. Mindful that "[l]oss of memory . . . is not always reflected in the record because what has been forgotten can rarely be shown," *Barker*, 407 U.S. at 532, our review of the record uncovers no impairment to Appellant's defense that Appellant has demonstrated is attributable to the Government's 103 days of delay between preferral and trial.

Because Appellant has not demonstrated he was subject to pretrial incarceration or restriction on liberty, particularized anxiety or concern, impairment of his defense, or unwarranted disruption of life caused by the 103 days of delay between preferral and trial attributable to the Government, we find no prejudice to Appellant caused by the delay. Without showing prejudice, Appellant has not established a Sixth Amendment speedy trial violation. *See Reed v. Farley*, 512 U.S. 339, 353 (1994) (holding "[a] showing of prejudice is required to establish a violation of the Sixth Amendment Speedy Trial Clause"); *Danylo*, 73 M.J. at 189 (holding appellant "has not demonstrated prejudice that rises to the level of a Sixth Amendment violation" and thus his "Sixth Amendment speedy trial rights were not violated"). Having carefully considered, applied, and balanced the *Barker* factors in this case, we find no violation of Appellant's Sixth Amendment right to speedy trial.

## D. Factual Insufficiency

In asserting factual insufficiency, Appellant contends that the Government failed to prove beyond a reasonable doubt that Appellant "reasonably should have known that [AG] was asleep"[30] when he committed the sexual assault and sexual contact offenses of which he was convicted.

---

[30] In announcing findings, the military judge excepted "knew or" from each charged specification, indicating he found beyond a reasonable doubt that Appellant reasonably should have known AG was asleep, but that the Government had not proved beyond a reasonable doubt that Appellant knew AG was asleep.

### 1. Law

We review issues of factual sufficiency de novo. *See* 10 U.S.C. § 866(d); *Washington*, 57 M.J. at 399. The test for factual sufficiency is "whether, after weighing the evidence in the record of trial and making allowances for not having personally observed the witnesses, the members of [the court] are themselves convinced of appellant's guilt beyond a reasonable doubt." *United States v. Rosario*, 76 M.J. 114, 117 (C.A.A.F. 2017) (quoting *United States v. Oliver*, 70 M.J. 64, 68 (C.A.A.F. 2011)). We may affirm only such findings of guilty as we find correct in law and fact. Article 66(d)(1), UCMJ, 10 U.S.C. § 866(d)(1). "In conducting this unique appellate role, we take 'a fresh, impartial look at the evidence,' applying 'neither a presumption of innocence nor a presumption of guilt' to 'make [our] own independent determination as to whether the evidence constitutes proof of each required element beyond a reasonable doubt.'" *United States v. Wheeler*, 76 M.J. 564, 568 (A.F. Ct. Crim. App. 2017) (alteration in original) (quoting *Washington*, 57 M.J. at 399), *aff'd*, 77 M.J. 289 (C.A.A.F. 2017). This court's review of the factual sufficiency of evidence for findings is limited to the evidence admitted at trial. *See United States v. Beatty*, 64 M.J. 456, 458 (C.A.A.F. 2007) (citations omitted); *United States v. Rodela*, 82 M.J. 521, 525 (A.F. Ct. Crim. App. 2021) (citation omitted).

In order to convict Appellant of the charged sexual assault, the Government was required to prove three elements beyond a reasonable doubt: (1) Appellant committed a sexual act upon another person; (2) the other person was asleep; and (3) Appellant knew or reasonably should have known that the other person was asleep. Article 120(b)(2), UCMJ, 10 U.S.C. § 920(b)(2); *MCM*, pt. IV, ¶ 60.b.(2)(e). To convict Appellant of the charged abusive sexual contact, the Government was required to prove three elements beyond a reasonable doubt: (1) Appellant committed sexual contact upon another person; (2) the other person was asleep; and (3) Appellant knew or reasonably should have known that the other person was asleep. Article 120(d), UCMJ, 10 U.S.C. § 920(d); *MCM*, pt. IV, ¶ 60.b.(4)(e).

### 2. Analysis

Contrary to Appellant's claim, proof that he reasonably should have known AG was asleep when he committed his offenses was extensive. In fact, the Government offered direct evidence of Appellant's understanding of his victim's sleeping state, which Appellant expressed just minutes after he sexually assaulted AG. While TSgt VA angrily confronted Appellant about the incident, TSgt VA asked Appellant "What the f[**]k happened, she's calling me, she's f[**]king crying. She f[**]king woke up and you were f[**]king touching her." Appellant responded "Yes." MSgt BS, a "good friend" of Appellant's, testified that a little later that morning, Appellant told his friend that Appellant

"sexually assaulted [AG] with his hands" and that he "put his fingers in her vagina when she was sleeping."

Beyond Appellant's own words, the testimony of his victim is important. AG testified she was asleep and awoke to Appellant's fingers inside her vagina and vulva. In fact, she testified that the force of Appellant's fingers "in [her], in [her] vagina," was what caused her to wake up. Statements admitted at trial that AG made to at least three other Air Force members in the minutes and hours immediately after the offenses were consistent with her trial testimony. Before the incident, Appellant and AG were work acquaintances; no evidence of a motive for AG to fabricate was presented at trial. Recognizing we did not personally observe AG as she testified, we find her testimony particularly credible. Evidence that Appellant's victim was actually asleep when he began sexually assaulting her not only supports the second element of each offense—that she was asleep—but also is evidence that Appellant reasonably should have known she was asleep.

Evidence of Appellant's awareness of AG's intoxication leading up to his offenses was also strong, and supports the conclusions that AG was later asleep when the offenses occurred and Appellant knew or reasonably should have known she was asleep. One of the hosts of the birthday party testified that "everyone" was intoxicated to some degree at the party. At one point while seated at a table and playing a drinking game, AG sat down on Appellant's lap. Appellant got her off his lap, telling her "You're too drunk for that." Later in the evening, while AG, Appellant, and SSgt DW were sitting on the couch, AG was sufficiently intoxicated that she was unaware her "skirt was riding up" and SSgt DW and Appellant attempted to get her to put on some shorts. Multiple witnesses testified they observed that AG was intoxicated by the end of the party.

One of the hosts of the party, TSgt VA, put AG to bed sometime between roughly 0200 and 0300 on 8 December 2019. TSgt VA did so because she was concerned AG was too intoxicated to drive home, was getting sleepy, and had just lain down on the couch in the living room, acting as though she was about to sleep there. TSgt VA was concerned enough about AG's state of intoxication that when she escorted AG to bed, she brought her "a trash can, just in case." Appellant witnessed TSgt VA take AG to the bedroom. Moments later, Appellant went into the bedroom where AG was then lying on the bed and said goodnight to AG and kissed her on the cheek in front of TSgt VA. During cross-examination, trial counsel asked Appellant about his awareness of the state of AG's intoxication and going to sleep. When trial counsel asked, "you knew that she was very intoxicated and that she had gone off to sleep," Appellant replied "Yes, sir." Trial counsel later inquired:

I just want to get this straight, so you're telling the court this young woman, who you barely knew, your one flirtation was when she was too intoxicated, goes to sleep, and you think it's appropriate then later around 4 a.m. to go and try to get into that bedroom with her?

Appellant replied, "Through many other actions of the night, I did feel that was appropriate, yes." We do not confuse "intoxication" and "sleep," which are treated separately under Article 120, UCMJ. However, evidence that Appellant was aware AG was intoxicated when she lay down in a bed and then went to sleep for some period is some evidence that Appellant reasonably should have known she was still asleep when he later climbed into her bed and put his fingers inside her and kissed her buttocks.

Evidence of Appellant's immediate consciousness of guilt was profound and is further, albeit indirect, evidence Appellant reasonably should have known AG was asleep when he accosted her. When confronting him moments after the incident, TSgt VA asked Appellant why he did it. Appellant replied that it was because he was drunk and said, "I honestly did not mean to do that, like f[**]king drinking, bad things when I'm drinking. Like I'm beyond sorry, I am absolutely sorry I did that to your friend." At trial, Appellant testified that AG invited him into the bedroom, let him lay down with her in her bed, and participated in sexual activity with him by moving her hips and moaning. During cross-examination, Appellant acknowledged that during his conversation with TSgt VA he never mentioned anything about AG letting him into the bedroom, never mentioned AG letting him into her bed, and never mentioned AG participating in any sexual activity or "touching on" him. In other words, in the immediate minutes after committing the offenses, while being confronted about what he had done, Appellant offered no explanation that AG had been awake or invited him into the bedroom or in any way invited or participated in his sexual assault and contact. Instead, he said "I am absolutely sorry I did that to your friend."

In fact, in separate conversations Appellant had with multiple individuals on 8 December 2019, Appellant repeatedly acknowledged he had "messed up," and yet told *no one* during those conversations that he thought AG had been awake or that she invited his presence in her room or his sexual advances. In addition to telling his "good friend" MSgt BS he had "put his fingers in her vagina when she was sleeping," Appellant repeatedly told MSgt BS he was sorry and had "messed up." CMSgt SG testified Appellant repeatedly told him he "messed up" and asked, "Holy s[**]t, what did I do?" SSgt DW testified Appellant told him on the morning of 8 December 2019 that Appellant had "fingered [AG] and he felt like crap." SSgt DW further testified Appellant said he felt especially bad because he knew another friend of his had been sexually

assaulted while she was sleeping. Appellant testified that he remembered calling another person, Ms. DE, that day and during that conversation he told her "I think I might have sexually assaulted somebody."

Appellant later attempted to explain that his statement to Ms. DE that he had sexually assaulted somebody was "worst case scenario" because "being a part of the military in general, anything sexually related is automatic sexual assault." Appellant further clarified that he does not have any specialized knowledge or training on the definition of sexual assault. At trial, Appellant also attempted to explain that his multiple emotional statements to others in the minutes and hours after the offenses to the effect that he had "messed up" were not admissions of guilt, but rather acknowledgments that he had "misread the situation." At trial Appellant was not asked to explain how his admission to TSgt VA that "[AG] woke up and [he was] touching her" was consistent with his assertion that he had simply "misread the situation." We find Appellant's explanations incredible. We further find Appellant's consciousness of guilt to be some evidence Appellant actually knew his victim was asleep when he began sexually assaulting her, further demonstrating he reasonably should have known AG was asleep.

The Government proved beyond a reasonable doubt all elements of the offenses of which Appellant was convicted and, after weighing the evidence and making allowances for not having personally observed the witnesses, we are ourselves convinced of Appellant's guilt beyond a reasonable doubt.

## E. Timeliness of Appellate Review

### 1. Law

Whether an appellant has been deprived of his due process right to speedy post-trial and appellate review, and whether constitutional error is harmless beyond a reasonable doubt, are questions of law we review de novo. *United States v. Arriaga*, 70 M.J. 51, 55 (C.A.A.F. 2011) (citing *Moreno*, 63 M.J. at 135).

In *Moreno*, the CAAF established a presumption of facially unreasonable delay when the convening authority does not take action within 120 days of sentencing, when a case is not docketed with the Court of Criminal Appeals (CCA) within 30 days of convening authority action, or when the CCA does not render a decision within 18 months of docketing. 63 M.J. at 142. This court has established an aggregated sentencing-to-docketing 150-day threshold for facially unreasonable delay for cases referred to trial on or after 1 January 2019. *United States v. Livak*, 80 M.J. 631, 633 (A.F. Ct. Crim. App. 2020) (deducing aggregate standard from standards announced by our superior court in *Moreno*).

If there is a *Moreno*-based presumption of unreasonable delay or an otherwise facially unreasonable delay, we examine the claim under the four factors set forth in *Barker*, 407 U.S. at 530: "(1) the length of the delay; (2) the reasons for the delay; (3) the appellant's assertion of the right to timely review and appeal; and (4) prejudice." *Moreno*, 63 M.J. at 135 (citations omitted). In *Moreno*, the CAAF identified three types of prejudice arising from post-trial processing delay: (1) oppressive incarceration; (2) anxiety and concern; and (3) impairment of a convicted person's grounds for appeal and ability to present a defense at a rehearing. *Id.* at 138–39 (citations omitted).

"We analyze each factor and make a determination as to whether that factor favors the Government or the appellant." *Id.* at 136 (citation omitted). Then, we balance our analysis of the factors to determine whether a due process violation occurred. *Id.* (citing *Barker*, 407 U.S. at 533). "No single factor is required for finding a due process violation and the absence of a given factor will not prevent such a finding." *Id.* (citation omitted). However, where an appellant has not shown prejudice from the delay, there is no due process violation unless the delay is so egregious as to "adversely affect the public's perception of the fairness and integrity of the military justice system." *United States v. Toohey*, 63 M.J. 353, 362 (C.A.A.F. 2006).

Recognizing our authority under Article 66(d), UCMJ, we also consider if relief for excessive post-trial delay is appropriate even in the absence of a due process violation. *See United States v. Tardif*, 57 M.J. 219, 223–24 (C.A.A.F. 2002).

### 2. Analysis

Applying *Moreno*, we find a facially unreasonable delay in this court issuing this opinion more than 18 months after the case was docketed with the court. Appellant was sentenced on 29 June 2022. The military judge signed the entry of judgment on 28 July 2022 and Appellant's case was docketed with the court on 3 November 2022. Appellant submitted his assignments of error brief on 28 December 2023. The Government submitted its answer on 29 January 2024, and Appellant replied to the answer on 5 February 2024. On the same day, Appellant requested oral argument on two of the five issues he asserted on appeal in his 28 December 2023 brief. On 15 February 2024, this court granted Appellant's motion in part and set oral argument for 21 March 2024. We subsequently ordered the parties to brief an issue Appellant raised at oral argument. The delay became facially unreasonable on approximately 3 May 2024.

Analyzing the *Barker* factors, we find the delay, which exceeded the 18-month presumptive standard by fewer than 3 months, was not excessively long.

The reasons for the delay include the time required for Appellant to file his initial brief with assignments of error, which he did on 28 December 2023, nearly 14 months after his case was docketed with the court, and after this court granted 11 Defense-requested enlargements of time. Beginning with his eighth request for enlargement of time, Appellant's counsel represented "Appellant is aware of his right to timely appeal, was consulted with regard to enlargements of time, and has consented to necessary requests for enlargements of time." An additional reason for delay was Appellant's request for oral argument, filed when he submitted his reply brief, 15 months after the case was docketed with the court. Additionally, Appellant's counsel raised a novel jurisdiction-related argument for the first time during his rebuttal at oral argument, prompting the court to order the parties to brief the issue, causing further delay.

Appellant has not asserted his right to speedy appellate review and was aware of and consented to multiple requests by his counsel for enlargements of time to file his initial assignments of error brief. Appellant has not pointed to any prejudice resulting from the presumptively unreasonable delay, and we find none. We also find the delay, including its causes, is not so egregious that it would "adversely affect the public's perception of the fairness and integrity of the military justice system." *Toohey*, 63 M.J. at 362.

We find no violation of Appellant's rights to due process or a speedy appellate review. We further determine Appellant is not due relief even in the absence of a due process violation. *See Tardif*, 57 M.J. at 223–24. Applying the factors articulated in *United States v. Gay*, 74 M.J. 736, 744 (A.F. Ct. Crim. App. 2015), *aff'd*, 75 M.J. 264 (C.A.A.F. 2016), we find the delays in post-trial and appellate review justified and relief for Appellant is not warranted.

## III. Conclusion

The findings and sentence as entered are correct in law and fact, and no error materially prejudicial to the substantial rights of Appellant occurred. Articles 59(a) and 66(d), UCMJ, 10 U.S.C. §§ 859(a), 866(d). Accordingly, the findings and the sentence are **AFFIRMED**.

FOR THE COURT

*Carol K. Joyce*

CAROL K. JOYCE
Clerk of the Court

49